## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **WINFRED MUCHIRA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 1:14-cv-00770 |
| | ) | (AJT/JFA) |
| **Halah Al-Rawaf, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANTS' RENEWED MOTION TO COMPEL DISCOVERY, MOTION FOR SANCTIONS AND MOTION FOR EXTENSION OF DISCOVERY PERIOD</u>

Defendants Halah Alrawaf, Ibraheem Alrashoudi, Fahad Alrashoudi, and Luluh Alrashoudi (collectively, the "Saudi Family"), have moved under Fed. R. Civ. P. 37 and Local Civil Rule 37 to further compel certain discovery from Plaintiff Winfred Muchira, to sanction Plaintiff for deleterious and prejudicial conduct and to extend the discovery period to allow Defendants a reasonable chance to investigate Plaintiff's claims based on the late-produced (or still unproduced) discovery requests. Defendants are before this Court for the third time, on the eve of the close of discovery, once again asking for Plaintiff to comply with her obligations under the Federal Rules and this Court's Orders.

Plaintiff has made serious allegations of human trafficking against the Saudi Family, including specific allegations of forced confinement, isolation, and restrictions on communication and religious freedom. It is beyond dispute that Defendants are entitled to defend themselves against those allegations - concretely, to prove they are false, fabrications, exaggerations and lies. Much of Plaintiff's version of events asks that Plaintiff's experts,

Defendants and eventually a jury "take her word" for the conditions she suffered. However, there is a mountain of contemporaneous evidence Plaintiff (and counsel for Plaintiff) has willfully failed to preserve, collect and produce. The rationales for these failures, from counsel, have been a reliance on the representations of the Plaintiff. In the words of Plaintiff rebutting the last Motion to Compel, when faced with the simple obstacle of an (allegedly) lost password, Plaintiff makes bare representations about the attempts to access this information, throws up her hands and says "No more is possible, or required." (Dkt. 61 at p 9). Of course, that is not, in any way, a correct statement of Plaintiff's (or counsel's) obligations under the rules. When ordered by this Court to produce an "account download" for Facebook, Plaintiff was indeed able to access the Facebook account (at least for one of three accounts). The resultant production was over 15,000 messages, produced less than two weeks before the close of discovery, many in Swahili, long after experts have evaluated this case, after depositions have been conducted and at a time when summary adjudication is far less valuable.

These same rationalizations about the limitations of Plaintiff's access apply to numerous other contemporaneous sources of information describing Plaintiff's true living conditions, social interactions and rationale for claiming to be a victim of human trafficking. The evidence is clear that not only are there other accounts used by Plaintiff that should be produced, but that those accounts very likely contain additional evidence directly contradicting Plaintiff's version of events. Email accounts, Skype Accounts, and any other form of electronic communication during a limited relevant time period should be compelled, immediately, and to the extent this information should have been produced, reviewed, obtained and preserved long ago, sanctions are warranted. Additionally, Plaintiff has avoided answering the most simple of Interrogatory questions regarding important information on money transfers. This too should be compelled.

Yet another discrete failure to comply with the Rules relates to Plaintiff's Expert psychiatric witness, Dr. Eric Goldsmith. On November 21, 2014, Dr. Goldsmith submitted an expert report pursuant to Rule 26(a)(2)(B), opining that plaintiff suffered from major depressive disorder while employed by the Saudi Family. That required expert disclosure did not list Dr. Goldsmith's alleged reliance or review of any of Ms. Muchira's Facebook postings among the materials he had considered in forming his opinion, nor did it disclose Dr. Goldsmith's opinions related to Ms. Muchira's Facebook postings. Instead, at deposition a month later, Dr. Goldsmith indicated for the first time that he reviewed Plaintiff's Facebook posting (obviously only a small fraction of them, as evidenced by the facts presented in this motion), and went on to provide expert opinion on the significance of those Facebook postings in clear violation of Rule 26.

Defendants want nothing more than a full and fair discovery of the relevant information surrounding Plaintiff's time with the Saudi Family and pursuant to the Rules, they are entitled to just that. To date, Defendants have been substantially prejudiced by Plaintiff's conduct (or lack of diligence) and seek the full range of sanctions available for the range of conduct at issue, including dismissal, claim preclusion, attorney's fees and costs associated with Plaintiff's conduct, adverse inferences on spoliation issues, and additional time to conduct discovery on late produced documents, facts and people who may have responsive information related to this lawsuit.

## **STATEMENT OF FACTS**

Plaintiff filed the instant Complaint on June 23, 2014. (Dkt. 1). Defendants served their document discovery requests on Plaintiff on September 30, 2014. Ex. A. Specific to this motion (and Defendants' prior Motion to Compel) Document Request 38 provided a time-limited, specific request for:

> All social media and electronic messages and/or postings sent by
> Plaintiff, including but not limited to Twitter, Facebook, and
> Instagram, from July 28, 2012, to and including April 1, 2013; any
> such postings or messages sent between April 1, 2013, and the
> present that pertain to any of the Defendants or Plaintiff's
> employment in the United States; and any responses to such
> postings or messages in any language.

*Id.* While Plaintiff made a partial production of a public-facing portion of a single Facebook

account, Plaintiff failed to produce the full account for any of Plaintiff's three Facebook

accounts, failed to produce a single responsive email (from any of at least nine email accounts),

and failed to produce any data from an existing Skype account.

On December 12, after numerous attempts to confer, demands for compliance, requests

for clarification and shifting rationales from Plaintiff, Defendants filed a Motion to Compel

before this Court. (Dkt. 58, 60) During the pendency of that Motion, the main Facebook

account at issue disappeared from public view. On December 19, this Court heard Defendants'

Motion to Compel and granted it in part. (Dkt. 65, 66, 69) Despite having been ordered by this

Court to fully produce any Facebook accounts (three) which were active during the identified

time period, as of December 29th, Plaintiff had failed to produce anything. At the close of

business on December 30th, Plaintiff produced an account download from the main Facebook

account ("Main[1] Facebook Account"), but nothing from the other two Facebook accounts. That

single download contained over 15,000 messages sent and received by Plaintiff during a time

when she was allegedly held in confinement and subject to living and working conditions worthy

of a federal lawsuit. These 15,000 messages, produced for the first time on December 30th, are

quintessentially relevant to every core issue in this dispute - Ms. Muchira's freedom of

---

[1] This Facebook account is referred to as the "Main" account for clarity and ease of reference.
Defendants have no knowledge as to whether the unproduced accounts contain more or less
information than this account.

communication, freedom of movement, freedom to practice her religion, living conditions, working condition, mental status, social interactions, financial relationships, and corroborating witnesses wholly undisclosed by Plaintiff.

Further, this account information from the Main Facebook Account directly contradicts a number of specific representations made by Plaintiff in opposition to the prior Motion to Compel, namely demonstrating Plaintiff's ability to access to this Facebook account during the pendency of this lawsuit, as well as further evidence of Plaintiff's use of email and use of Skype. Indeed, while counsel for Plaintiff represented to this Court that they had done everything they could to access Facebook and Plaintiff simply didn't remember her password, those representations appear to be patently false. (Dkt. 61 at 9). First, after this Court's order, and according to Plaintiff's counsel, Plaintiff was able to access this Main Facebook Account using nothing more that publicly available access tools. Ex. B, Email from Yates to Koslowe dated Dec. 30, 2014. Despite repeated requests to confirm the scope of their efforts, counsel for Plaintiff has not indicated that anybody (counsel or Plaintiff) contacted (or attempted to contact) Facebook outside of normal user channels to rectify this "alleged" lack of access. Moreover, Plaintiff's proffered lack of access is just that - "alleged." In reality, the Main Facebook Account download provided on December 30 indicates that Ms. Muchira accessed this Facebook account on June 24, 2014, *after* the instant Complaint was filed. Ex. C, Facebook access date record produced by Plaintiff. Additionally, the Main Facebook Account download also shows Ms. Muchira actively messaging friends in this account as recently as June 5, 2014, just weeks before the Complaint was filed. Ex. D, Messages by Plaintiff on June 5, 2014. Taken at its most innocuous, this indicates that Ms. Muchira "forgot" how to access her Facebook account during the pendency of this litigation, and that pre-filing of this lawsuit, counsel did nothing to preserve

this obviously relevant information, produce it during litigation, let alone use it corroborate factual allegations sourced only from Ms. Muchira pre-suit.

Turning to the issue of Dr. Goldsmith's report, on November 21, 2014, Dr. Goldsmith submitted an expert report opining that plaintiff suffered from major depressive disorder while employed by the Saudi Family listing his opinions and materials upon which he relied, as required by Rule 26(a)(2)(B).  Ex. E, Report of Dr. Goldsmith.   Dr. Goldsmith notably did not mention in his report that he had read a single one of Ms. Muchira's Facebook postings, did not list Ms. Muchira's Facebook postings among the materials he had considered in forming his opinion, did not discuss or analyze any of Ms. Muchira's Facebook postings, and he did not disclose any opinions he had concerning the significance of those postings.  *Id.; see also* Ex. F, Deposition of Eric Goldsmith, M.D. (Dec. 22, 2014) ("Goldsmith Dep.") at 127:9-128:18.  Yet, at Dr. Goldsmith's deposition a month later, on December 22, 2014, he testified contrary to his report -- not only that he had in fact reviewed these postings (*see* Ex. F., Goldsmith Dep. at 96:1-97:20) but also offered various theories about Ms. Muchira's Facebook postings that were not set forth anywhere in his expert report and which Defendants, therefore, could not have anticipated at the deposition.  *See id*. at 233:7-17, 237:11-240:18, 264:13-265:17.

On December 31, 2014 Defendants held a meet and confer call with Plaintiff where all of the deficiencies discussed herein were raised.  Plaintiff made no firm promises, did not offer any significant resolution to the failure of Dr. Goldsmith to comply with the requirements of Rule 26(a)(2)(B), has failed to supplement production on any of these issues, and once again simply promised to "ask Ms. Muchira" about these issues and "look into" these issues.  Simply put, the time when counsel should have been "looking into" these issues has long passed.

## ARGUMENT

## I.      The Legal Standard

There is no dispute about the broad parameters provided by The Federal Rules of Civil Procedure to permit "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "The discovery needs to be 'reasonably calculated to lead to the discovery of admissible evidence.'" *LifeNet Health v. LifeCell Corp.*, No. 2:13-cv-486, 2014 WL 4162113, at *3 (E.D. Va. Aug. 19, 2014) (quoting Fed. R. Civ. P. 26(b)(1)).

### A. Legal Standard for Non-Expert Discovery Sanctions

Sanctions for discovery violations in this Court are generally governed by Federal Rule of Civil Procedure 37. *See Rabb v. Amatex Corp.*, 769 F.2d 996, 999 (4th Cir.1985). Among the remedies provided by Rule 37(b), the Court may preclude evidence or claims, establish facts or dismiss the case where a party has failed to comply with discovery orders. Fed.R.Civ.P. 37(b)(2)(A). This Court has broad discretion to impose sanctions and to dismiss an action pursuant to Rule 37(b). *See Rabb*, 769 F.2d at 999. District Courts "must have the authority to control litigation before them, and this authority includes the power to order dismissal of an action for failure to comply with court orders." *Ballard v. Carlson*, 882 F.2d 93, 95 (4th Cir.1989). Moreover, this Court has additional authority under Rule 37(c) when a party fails to supplement prior discovery responses. Of course, this Court also has the inherent authority to sanction conduct, even if that conduct may not violate an express Order of the Court. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir.2002) (discussing sanctions for party's failure to timely produce emails); *U.S. ex rel Rector v. Bon Secours Richmond Health Corp.*, 2014 WL 66714 at *4 (E.D. Va., Jan. 6, 2014) (acknowledging

court's inherent authority to sanction outside of Rule 37); *Titan Atlas Manuf. Inc, v. Sisk*, 2012 WL 5494459 at \*2 (W.D. Va., Nov. 13, 2012) (imposing sanctions in absence of explicit order).

In looking at the appropriate level of sanction, the Fourth Circuit has articulated four factors to consider: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir.1998); *accord Belk v. Charlotte–Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir.2001)(en banc).

### B. Obligations and Sanctions Related to Expert Disclosure

Rule 26 mandates that an expert report must contain, *inter alia*:  "(i) a complete statement of all opinions the witness will express and the basis and reasons for them;" and "(ii) the facts or data considered by the witness in forming them.  Fed. R. Civ P. 26(a)(2)(B).  In other words, "'the expert report should be written in a manner that reflects the testimony the expert witness is expected to give at trial'" (*Campbell v. United States*, 470 Fed.Appx. 153, 156 (2012) (quoting *Sharpe v. United States,* 230 F.R.D. 452, 458 (E.D.Va.2005))) and must be sufficiently detailed and complete to enable adequate preparation by Defendants.  *See, e.g., Sharpe,* 230 F.R.D. at 458-9 (citing *Salgado v. Gen. Motors. Corp.,* 150 F.3d 735, 742 n. 6 (7th Cir.1998) ("an expert report must be detailed and complete so that 'opposing counsel is not forced to depose an expert in order to avoid ambush at trial and sufficiently complete so as to shorten or decrease the need for expert depositions and conserve resources'"); *see also,* Advisory Committee's Notes to the 1993 Amendments to Rule 26.  Rule 26 was amended in 1993 to add the requirement of a detailed disclosures in a written expert report because "[t]he information disclosed under the

former rule in answering interrogatories about the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness."  Advisory Committee's Notes to the 1993 Amendments to Rule 26.  Indeed, the "most important element" of a Rule 26 expert report is "whether the report prepared … contains a complete statement of his opinions and the basis for his opinions."  *Campbell v. McMillin,* 83 F.Supp.2d 761, 764 (S.D. Miss. 2000); *see also Sharpe,* 230 F.R.D. at 46.

The question of sanction related to the failure to produce a complete and sufficient expert report is handled differently, following the explicit language of Rule 37(c)(1):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed.R.Civ.P. 37(c)(1).  As the Fourth Circuit has stated, Rule 37 "impose[s] an "automatic sanction" of exclusion of a party's expert witness for failure to adhere to the expert witness requirements set forth in Rule 26(a)," *Campbell*, 470 Fed.Appx. at 156; *see also S. States Rack & Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 592 n. 2 (4th Cir.2003) ("The Rule 37(c) advisory committee notes emphasize that the automatic sanction of exclusion provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence.").   As the Fourth Circuit has explained, such sanctions are justified given the importance of expert reports in discovery:

> Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case.

*Wilkins*, 751 F.3d at 221 (citations omitted).

There are only two exceptions to the sanction of automatic exclusion of the expert pursuant to Rule 37(c)(1) for failing to make proper disclosures: "(1) when the failure to disclose is 'substantially justified,' and (2) when the nondisclosure is 'harmless.'" *Wilkins*, 751 F.3d at 222 (*quoting S. States*, 318 F.3d at 596–97). Imposing the automatic sanction of exclusion of the expert pursuant to "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules." *S. States*, 318 F.3d at 596. As the Fourth Circuit further explained in *Southern States*, excluding evidence only when the nondisclosing party acted in bad faith would undermine the basic purpose of Rule 37(c)(1): preventing surprise and prejudice to the opposing party" and would improperly shift the burden of proof from the nondisclosing party. *Id.*

## II. Renewed Motion to Compel Electronic Communications and Interrogatory Responses

Plaintiff's Complaint alleges a wide range of facts and harms allegedly associated with Ms. Muchira's claims she was a victim of human trafficking. These factual assertions are concrete, serious and include such things as forced isolation/seclusion (Compl. ¶¶57-59, 64), inability to leave the house alone (Compl. ¶57), not being allowed to attend church services (Compl. ¶¶63-64), no access to transportation (Compl. ¶66), prevention from communication with others (Compl. ¶58-59), substandard living conditions of a dreary basement room with no heat (Compl. ¶¶46-47), long work hours with no days off (Compl. ¶¶41-42). While Ms. Muchira is certainly entitled to present her version of these events through her own testimony, there unquestionably exists contemporaneous evidence that might corroborate or cast doubt upon Ms. Muchira's claims. The Facebook accounts are one of these contemporaneous accounts that this Court has rightly ordered to be compelled. However, based in large part on counsel's

representations that 1) Plaintiff could not access any email accounts and 2) Plaintiff was not a user of email (or other electronic communication services, such as Skype), this Court did not reach whether it would compel production of other form of electronic communication, asking the parties to inquire further at the deposition of Ms. Muchira about her usage. (Dkt. 69).

Based on the information just disclosed from the Main Facebook Account, as well as other relevant facts, Defendants ask this Court to immediately compel production of responsive email and other forms of electronic communication (including Skype). Simply put, if Plaintiff's counsel is correct, and there are no responsive documents, then that order to Compel will be easy to comply with. However, Plaintiff's representations about her ability to access and use of email are no more correct than her representations about her ability to access her Facebook account.

**A. All Responsive Electronic Communications to Document Request 38 Should be Compelled.**

Defendants ask this Court to Compel full compliance with Document Request 38, regardless of the source of the electronic material. It is not Defendants' obligation under the rules to track down every possible account/service Ms. Muchira had during this period and find external evidence each account was used during the relevant period. Plaintiff is well-aware of whatever electronic communications she may have had (email, Skype, Twitter, Instagram, chat services, dating services, etc.) and she should be compelled to fully comply with Document Request 38. That said, Defendants are specifically aware of two forms electronic communication that exist and Plaintiff has steadfastly refused to produce or even collect.

*i. Email*

Email to/from Ms. Muchira during the limited timeframe contained in Document request 38 is wholly relevant to Plaintiff's claims. From her living conditions to her mental state,

communications during a period where Ms. Muchira was allegedly the victim of human trafficking will speak to the authenticity of those claims. Counsel's arguments before this Court in defense of prior Motions to Compel on this issue have it backwards - litigants do not need to elicit testimony from party opponents to establish email use before that email should be produced or compelled.

Moreover, Plaintiff's position regarding email use during this period is simply unsustainable in light of the facts established to date. Plaintiff had no less than nine email accounts - W********0@gmail.com; w************a@gmail.com; w*********0@yahoo.com; w***********a@hotmail.com; w*********11@yahoo.com; w*******y.9@facebook.com; w***************3@facebook.com; w*******jeri11@yahoo.com; m******w@yahoo.com.[2] Plaintiff makes frequent reference to emailing or her inbox in her public Facebook account. Ex. G, Excerpts from Plaintiff re Email. Those references continue in the private messages produced on December 30, 2014 as part of the download from the Main Facebook Account. Ex. H, Excerpts from Private Message re Email. Moreover, the Main Facebook Account Download definitively shows that throughout the relevant time period Plaintiff was receiving numerous emails directly from Facebook. Ex. I, "Contact Info" (indicated email addresses on file) & "Settings" (indicating notification preference set to "EMAIL"). Plaintiff had numerous account notification setting set to directly

---

[2] It should also be noted that counsel for Plaintiff knew of at least four of these email accounts but actively withheld information about their existence for months, based on a unilateral redaction policy, unauthorized by this Court, removing Ms. Muchira's "contact information" from relevant documents. This was one of the issues raised in the last Motion to Compel and this Court ordered a full production absent redaction, under an AEO framework. (Dkt. 69, Tr. at 53:7-16). Defendants first learned of many of these email accounts with that production, just days ago. Plaintiff received no prior authorization to willfully withhold this information (such as a protective order or agreement of the parties).

email her when communications (or other activity) came in through Facebook.  *Id.*  Plaintiff also accumulated email addresses of friends and acquaintances throughout this period, the most likely reason for which would be to use them to communicate by email.  Ex. J, Selected excerpts from personal journals containing email addresses.

Plaintiff's counsel cannot represent to this Court that there are no responsive emails for one simple reason - they haven't looked.  When pressed in the meet and confer, counsel could not identify which of the at least nine email accounts they have *even attempted* to access.  Plaintiff's position is that if she cannot remember a password to an account, her duty ends.  That is a ridiculous and unsupportable position.  Electronic communications are no different than any other form of discoverable material in many ways.  This Court would not hesitate to compel the production of a box of relevant correspondence belonging to a litigant that happened to be held at a friend's house.  It would not hesitate to compel the production of a diary, just because the owner can't find the key.  The question of what happens if Plaintiff can still not produce this relevant information once compelled is rightfully not at issue yet.  Conversely, however, Defendants' right to obtain it and have it compelled under the Rules is ripe.

### ii. Skype

Similarly, there is no dispute that Plaintiff has at least one Skype account - in her name, with an account name of w********9.  Moreover, there is no dispute that a Skype account existed during the relevant time and we have ample evidence of Plaintiff referencing its use.  Ex. K, Excerpts from Facebook messages re Skype.  Maybe the Skype account contains harmful admissions or maybe it was never used much - but either way the information contained in the account is responsive to Document Request 38 and should its production should be compelled.

**B. Plaintiff Should be Compelled to Produce a Response to Interrogatory 9**

Interrogatory 9 asks Plaintiff to "Identify any person who received money from you from July 28, 2012, to and including April 1, 2013, the amount that person received, and the financial institution, if any, that you used for that purpose." In response to this interrogatory, Plaintiff provides no answer, but points to her answer to Interrogatory 1. Ex. L, Interrogatory Reponses dated Nov. 3, 2014. At best, in that interrogatory response Plaintiff says she "transferred nearly all of this money [presumably $1200]" to her sister and later says she "transferred my pay" to her sister. Interrogatory 9 is a simple question and deserves a simple answer. *Id.* The relevance of this information is self-evident - Plaintiff's math does not add up. Defendants are entitled to understand precisely what Plaintiff says happened to her salary during the period in question as well as how much money she has access to, and establishing a firm answer on her transfers to her family is a key component of those inquiries.

**III. Plaintiff's Egregious Discovery Conduct Justifies Sanctions and Relief**

**A. Plaintiff has Continuously Delayed and Denied Discovery Production**

**i. Factual Basis**

On December 19th, 2014 this Court ordered Plaintiff to produce a number of documents. (Dkt. 65, 66 & 69) Among the items compelled were complete productions of any Facebook account active during the date range identified in Document Request 38. Defendants are aware of, and have made Plaintiff aware of, at least 3 Facebook accounts which meet that criteria. Yet to date, Plaintiff has made ***absolutely no production*** of documents from two of these accounts. As related to the third, the Main Facebook Account, Plaintiff re-activated that account (which had disappeared during the pendency of the December 19 Motion to Compel) on December 25

and obtained a download of that account on December 26. Plaintiff did not produce that download to Defendants until December 30th, however.

There are a number of important points for the Court to note as it examines Plaintiff's compliance with the Rules and this Court's Order. First, nothing changed, yet Plaintiff was somehow finally able to comply armed only with this Court's admonition. According to Plaintiff's counsel, Plaintiff did not rescue this account by contacting Facebook's corporate offices or counsel - Plaintiff simply used the account recovery tools available to it all along to regain access to this account. Ex. B, Email from Yates to Koslowe, dated Dec. 30, 2104. There is no reason that these steps should not have been taken months before this Court compelled the production - indeed counsel should have reviewed this material pre-suit to corroborate the factual allegations made on behalf of Plaintiff. While Plaintiff dismissed the notion as "bluster" that access to Plaintiff's own electronic accounts is "readily available" to her, even if she's allegedly forgotten how to access the information, Plaintiff's ultimate access without intervention outside of normal user interfaces demonstrates that simple conclusion to be true.[3] (Dkt. 61 at 8, fn 5).

Second, the Main Facebook Account download makes clear that this Account had been accessed by Ms. Muchira _after_ this Complaint was filed and actively used for communication just weeks before. Ex. C. Plaintiff represented to this Court in response to the last Motion to Compel that she did "not have the information required to access [that] account any longer." (Dkt. 61 at 9). Whether true at the time the Opposition Brief was filed (December 17, 2014) that statement was certainly not true when the Complaint was filed. Ex. C, Facebook Access Records. Moreover, contrary to counsel's assertions in defense of the last Motion to Compel, the

---

[3] That is not to suggest, however, should Plaintiff need to pick up the telephone to contact a service provider to access her own information, that such action would be burdensome or outside of her obligations under the Rules.

download makes it clear that Ms. Muchira was fully in control of her own Facebook account, changing passwords on that account at several points and even "un-friending" Defendant Luluh Alrashoudi. Ex. M., Facebook records documenting password changes; Ex. N, Facebook Friend Removed records. For Plaintiff's part, the inability to access this account when it came time to produce it in discovery is either feigned ignorance, an intentional misleading of her counsel or a remarkable coincidence that could have been avoided by prompt preservation of evidence. According to their own privilege log, counsel for Plaintiff has been retained and allegedly anticipating litigation for nearly a year before the instant Complaint was filed. In any event, the substantial delay in producing responsive documents that should have been available to Plaintiff is sanctionable, in and of itself. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir.2002).

Third, once produced, the Main Facebook Account contained over 15,000 responsive messages[4] that were previously unproduced. As these messages were produced just days ago, counsel for Defendants is still in the process of evaluating the many ways in which these messages directly contradict Plaintiff's specific factual allegations in her complaint. In and of themselves, 15,000 messages constitute an indictment on claims of social isolation. But, more concretely, these messages speak to Plaintiff's mental state, romantic dalliances, freedom of movement, comfort in the Saudi Family's home, access to transportation, financial compensation and true motivations and plan surrounding her current allegations that she was the victim of human trafficking. The prejudice associated with this late production will be discussed below.

---

[4] Adding to the effective burden and delay, a significant percentage of these messages are written in Swahili, meaning that the full import of those messages cannot be quickly ascertained.

Fourth, even the Main Facebook Account has yet to be fully produced. Certain information is noticeably absent from the download provided by Plaintiff, including references to places visited by Ms. Muchira, a key aspect of Plaintiff's allegations. Ex. O, Facebook Places. Additionally, information regarding access to Facebook (log-in times, session times) is truncated - plainly missing older information that would be relevant to show the scope of her ability to use social media, and thereby freedom and free time during Plaintiff's stay with the Saudi Family. Ex. C, Facebook Login records. Even if that truncation was the result of action by Facebook, Plaintiff's neglect in preserving this information since the anticipation of litigation (according to Plaintiff's privilege log, July 2013) means that a large part, if not all, of the spoliation regarding this data could have been prevented by simple preservation efforts. Additionally, while Plaintiff represented she had "produced ...all available [public] information from the old Facebook account" even that is not correct, and has not been supplemented with the production of the Main Facebook Account download. (Dkt. 61 at 4). Indeed, Plaintiff did produce a version of her public-facing Main Facebook Account in discovery, prior to the Motion to Compel, but that version plainly omits relevant communication to and from Ms. Muchira. *Compare* Ex. P, Muchira 170-71, as produced first two *with* Ex. Q., complete version of first two pages of Main Facebook Account downloaded by Defendants. That deficiency has yet to be corrected in compliance with Plaintiff's obligations under the rules or this Court's December 19 Order.

Finally, and perhaps most egregiously, 2 of 3 Facebook accounts *have not been produced at all as required by this Court's Order.* Given that a single Facebook account yielded over 15,000 relevant messages, these two other accounts may be repositories of significant

17

information related to this case.[5]  Plaintiff has been compelled to produce these accounts by this Court, yet no additional production has been made.  Sanctions are plainly warranted.

### ii. Analysis of Appropriate Sanctions and Relief

Based on the wide-ranging disregard for the discovery process, this Court's Rules and its Orders, the imposition of serious sanctions is warranted.  Defendants fully believe that the most serious of sanctions, striking the pleadings/dismissal is justified under these facts.  If the withheld information contained in these Facebook accounts had been properly preserved, reviewed and/or produced, Defendants firmly believe that Plaintiff's counsel would have seriously questioned the veracity of Plaintiff account of the events in the instant Complaint or, at a minimum, Defendants would have been in a position to short-circuit the litigation on a Summary Judgment motion.  Of course, Defendants recognize the caution with which this Court issues severe sanctions and therefore ask this Court to consider the full range of other sanctions available pursuant to Rule 37 and this Court's inherent power.  Specifically, Defendants believe that lesser sanctions, including monetary sanctions and adverse inferences and/or instructions could also rectify some of the prejudice to Defendants.  Aside from sanctions, Defendants also request an extension of the discovery period in the case to deal with the onslaught of additional messages, let alone the witnesses they implicate at the close of the discovery period.

To determine the appropriate level of sanction, whether pursuant to Rule 37(b) or this Court's inherent authority, this Court should look to Fourth Circuit's test in *Anderson*,[6] 1) degree

---

[5] Plaintiff, herself, has indicated that she was actively using multiple Facebook accounts.  *See* Ex. R, post dated Thursday, June 5, 2014 "Uuuui i have many ,fb accounts,God help me.am doing chat with them all eheheeeeee!!!!"

[6] Additionally, this Court also has available to it additional sanctions pursuant to 37(c) for Plaintiff's failure to supplement in accordance with Rule 26(e).

of bad faith, 2) prejudice to Defendants, 3) Need for deterrence and 4) availability of less drastic sanctions. 155 F.3d at 504.

### a. Degree of Bad Faith

The first factor under the *Anderson* test is "whether the non-complying party acted in bad faith." Here, the bad faith of Defendant is significant and multi-layered. Unlike many cases, the bad faith in this circumstance is not due to intentional disregard of multiple court orders. *See*, *e.g.*, *Rosemond v. United Airlines, Inc.*, 2014 WL 4245974 (E.D. Va. Aug. 26 2014) (J. Anderson finding bad faith associated with disregard of multiple court orders). Instead, the bad faith here is visible through the full range of conduct of Plaintiff personally and by extension, the representations of counsel. We now know, for a fact, that at the time of the filing of this suit, Ms. Muchira could access this Facebook account. Ex. C. Instead of providing access (either in response to discovery requests when sent, or in the pre-filing investigation of her counsel), she feigned an inability to access this account, suggesting that it was an "old" account, set up by the Saudi Family. In reality, the documents from Facebook show that Ms. Muchira knew quite well how to change passwords, access Facebook on multiple devices and exclude people from her account when she felt the need. Ex. C, I, M, & N, Facebook records. Moreover, the vast communication held within this account, coupled with Plaintiff's allegations of isolation and mental trauma lead to the conclusion that the failure to access the Main Facebook Account in a timely fashion was done to avoid the disclosure of information that was detrimental to Plaintiff's case, either to her own counsel or Defendants specifically. This Court should also take note of the same explanation being used to justify the failures to produce emails or other forms of responsive electronic communications. It is remarkably easy for Plaintiff to feign forgetfulness

in the face of a login page, rather than answer her obligations under the Rules and test the veracity of her allegations before this Court.

### b. Prejudice

The second factor this Court should consider in determining the appropriate sanction is "the amount of prejudice that noncompliance caused the adversary." Here, the effects of the delayed and denied productions are wide-ranging and highly prejudicial, given this Court's rigorous discovery schedule. As previously mentioned, at the most basic level, had this discovery been produced in a timely fashion, this Court would have already had before it a Summary Judgment motion based on the clear contradictions between Plaintiff's allegations and her contemporaneous communications. However, that prejudice does not stand alone. The 15,000 messages provided days before the close of discovery contain substantial communications with material witnesses who should have been disclosed and may have very relevant information about Plaintiff's mental state, freedom of movement, isolation, church attendance, living conditions and a multitude of other key issues. Defendants will have a very limited ability to marshal additional evidence and testimony from these key witnesses given the 11th hour production of this core information (and continued failure to produce other core information).

Additionally, Defendants engaged a forensic psychiatrist to evaluate Ms. Muchira, specifically in reference to her claims of mental distress. Dr. Khin Khin, Defendants' expert, evaluated all available contemporaneous communications and writings of Ms. Muchira to analyze (in conjunction with Plaintiff's own account via interview) the sincerity and accuracy of Plaintiff's post-hoc claims of mental anguish. Ex. S, Report of Dr. Khin Khin. However, instead of a complete review of Plaintiff's contemporaneous communications, due to Plaintiff's

deleterious conduct, Dr. Khin Khin's report was based on the tip of the iceberg - literally a

fraction of the postings and messages that Plaintiff sent or received.  Dr. Khin Khin has issued

her report and been deposed.  Based on this voluminous and critical nature of the information on

her mental state (including undisclosed numerous romantic relationships, friendships and a

fiancée), Dr. Khin Khin will need to re-examine all of this information and issue a revised

supplemental report.  Of course, all expert and fact witnesses already deposed were done so

without benefit of this important information as well.

Fundamentally, these Facebook messages directly contradict to vast portions of

Plaintiff's factual allegations.  Defendants want nothing more than the opportunity to defend

themselves against Plaintiff's allegations.  By withholding, significantly delaying and feigning

the inability to access thousands of relevant messages, Plaintiff has prevented Defendants from

mounting a full defense against her claims - the very definition of prejudice.  *See Rosemond*,

2014 WL 4245974 at *7 (conduct "was prejudicial ... because [defendant] could not defend

against claims, facts and witnesses that [plaintiff] refused o provide...) *quoting United States v.*

*One Tract Real Property*, 107 F.3d 868, 1997 Wl, 71719, at *3 (4th Cir. 1997) (table).

### c.  Need for Deterrence

The third factor this Court should weigh in establishing the appropriate level of sanction

is the "the need for deterrence of the particular sort of non-compliance" at issue in this case.

That issue presents a thorny, delicate and perhaps unique set of factors that implicate the serious

nature of Plaintiffs claims as well as the *pro bono* nature of the represents by her counsel.

Plaintiff has very loudly and very publicly claimed that she was the victim of human trafficking

by the Saudi Family.[7]  In fact, Plaintiff's contemporaneous correspondence from the Main

Facebook Account, produced just days ago, indicates that she was looking for any way to stay in

the U.S. as her visa with the Saudi Family was coming to an end.  She wanted a better job in

America, but her visa required that she return home to Kenya, soon.  Plaintiff has utilized

allegations of human trafficking as a means to extend her visa status, and her concealment of the

true scope and nature of her contemporaneous communications from Defendants (and

presumably her own counsel) has been a necessary tool for that abuse of process.  A seemingly

powerless immigrant armed with *pro bono* representation by a powerful law firm can wield a

damaging sword against a family whose name, reputation and wealth are on the line, especially if

discovery is treated as optional or factual assertions are not verified.  Here verification was a

click away, in Facebook or email.  *Pro bono* representation of disadvantaged clients is a good

and noble endeavor of our profession, but the a *pro bono* party must be held to the same

standards as all other civil litigants.

### d.  Appropriate Level of Sanctions

The fourth factor this Court should examine when determining the correct sanction in this

circumstance is "whether less drastic sanctions would have been effective."  As discussed above,

the Defendants believe that the appropriate level of sanction in this situation is to strike the

Complaint/dismiss, pursuant to Rule 37(b)(2)(A)(iii & v) or this Court's inherent authority based

on Plaintiff's failure to comply with this Court's Order and her pervasive delay tactics.  The

rationale for this admittedly significant relief is largely because of two factors - the seriousness

of the conduct effecting the level playing field of litigation and the relative inappropriateness of

---

[7] There were several public news articles about this case upon its filing.  See, e.g.,
http://www.courthousenews.com/2014/06/27/69084.htm

other sanctions. So, for example, while the Defendants would welcome a sanction associated with the cost of these motions or of producing a supplemental expert report, Plaintiff is a *pro bono* party without the funds to satisfy even a token sanction. Similarly, half measures, such as establishing facts adverse to Plaintiff or barring a claim or defense are not well-suited to the type of harm here. Plaintiff delayed and failed to produce significant evidence that contradicts her factual assertions. Defendants are entitled to have that evidence, not hope that a jury credits an instruction or judicially-established facts. The evidence of her true motive, true mental state and true living conditions would have been far more powerful than a sterile instruction. That is precisely why Plaintiff has continued to delay and withhold the production of her relevant electronic communications. Given that incalcitrance the Court must treat the conduct of Plaintiff as a serious breach of the Rules of this Court and issue sanctions appropriately.

### e. Extension of Discovery

While it is no doubt disfavored in this jurisdiction, given the serious volume of late produced documents, need for translation, new witnesses implicated and remaining information still yet to be produced, Defendants respectfully request an extension of discovery for 6 weeks (and a concomitant postponement of the January 15, 2015 scheduled pre-trial hearing) to allow Defendants time for additional discovery requests and/or subpoenas necessitated by Plaintiff's delayed and missing production of documents. *See* Local Rule 37(F).

### B. Plaintiff Failed to Disclose All Opinions and Data Considered By Dr. Goldsmith in his Expert Report

### i. Factual Basis

On November 21, 2014 Dr. Goldsmith submitted his export report, which contained no reference to any review by Dr. Goldsmith of Ms. Muchira's Facebook postings, nor any

disclosure of opinion he had regarding those postings.  Ex. E.  As has been previously presented

to this Court and has been detailed above, the postings, messages, photos, and other information

found in Ms. Muchira's Facebook account are perhaps the most important documents in this

case.  Ms. Muchira's Facebook account contains extensive contemporaneous information across

the eight months she worked for Saudi Family in the United States.  These Facebook postings

provide a real-time view of – and largely contradict – the numerous allegations at the heart of

this case regarding Ms. Muchira's alleged working conditions and hours, living conditions,

social isolation, ability to attend church, ability to practice her religion, emotional state, physical

condition, and other issues.

     Defendants engaged Dr. Eindra Khin Khin to rebut Dr. Goldsmith's report.  Relying on

documented practices for conducting forensic assessments, she determined that Dr. Goldsmith's

failure to read or consider the Facebook postings was an egregious error that utterly failed to

comply with proper forensic procedure.  As a result, Dr. Khin Khin devoted a significant portion

of her rebuttal report, served on December 19, 2014, to Dr. Goldsmith's failure to read or

consider the impact of Ms. Muchira's Facebook postings.[8]  Ex. S.  Similarly, counsel for

Defendants spent preparation time reviewing articles regarding forensic psychiatric assessments,

requirements for forensic psychiatry certification, ethics guidelines for forensic psychiatry and

other sources in order to develop deposition questions for Dr. Goldsmith that would challenge

his failure to review or consider this critical information.

---

[8] For that matter, neither Dr. Goldsmith nor Dr. Khin Khin has had the benefit of reviewing the majority of information in Ms. Muchira's Main Facebook Account, as Plaintiff has inexcusably delayed production of this information, as addressed above.  Certain of this information still remains unproduced and other information – including approximately 15,000 new messages – was not produced until the close of business on December 30, 2014, months after it was due and after Plaintiff's expert and Defendants' rebuttal reports had been served.

At his deposition on December 22, however, Dr. Goldsmith offered opinions that went far beyond anything disclosed in his report.  Dr. Goldsmith testified not only that he <u>had</u> in fact reviewed the Facebook postings in formulating his opinion but that he did not identify anything in the Facebook postings that was inconsistent with what Ms. Muchira had told him, the other documents in this case, or his diagnosis of major depressive disorder.  Ex. F at 97:8-15, 264:2-5. Counsel immediately protested being blindsided in this fashion.  *Id.* at 98:5-99:16.  As the deposition was already in progress, counsel for Defendants had no choice but to improvise questions without any opportunity to prepare for this wholly unexpected development.

The omission of the Dr. Goldsmith's consideration of or opinions regarding Ms. Muchira's Facebook postings is not a technical issue, either.  When confronted with some of Ms. Muchira's Facebook postings, Dr. Goldsmith acknowledged that certain statements made and activities photographed by Ms. Muchira were <u>not</u> consistent with the symptoms of major depressive disorder. [9]  Dr. Goldsmith further acknowledged that "[t]here was nothing the Facebook account that would confirm my diagnosis of major depressive disorder" (*Id*. at 236:4-6), and that Ms. Muchira's Facebook postings could be consistent with Ms. Muchira actually being happy and going out and enjoying herself.  *Id*. at 240:10-18.  But, Dr. Goldsmith opined

---

[9] *See,* Ex. F, Goldsmith Dep. 175:4-177:4 (noting that he would not expect someone with major depressive disorder to feel good, have no troubles, be in a good mood, to be joyful or living a joyful life, or enjoy everyday activities such as shopping eating, or talking to friends).  When pressed, Dr. Goldsmith found a number of statement and photographs in Ms. Muchira's Facebook account to be inconsistent with the symptoms of major depressive disorder.  *Compare* Ex. T, MUCHIRA 427 "am so fresh and sober that I could handle any situation so far.  I am anointed for greatness in me." *with* Dep. at 249:7-250:2; Ex. T, MUCHIRA 404 "Winnie enjoying the day." *with* Dep. at 251:2-11; Ex. T, MUCHIRA 391 "Winnie.  Nice weekend." *with* Dep. at 252:3-18; Ex. T, MUCHIRA 379 "Winnie happy day as usual." *with* Dep. at 253:10-21; Ex. T, MUCHIRA 214 "Yeees happy life am enjoying day after another." *with* Dep. at 262:4-262:20.

that the Facebook postings were "not necessarily an accurate communication about her state of mind" (*Id*. at 233:7-17) but were essentially "to communicate a certain state of well-being here in America to family and friends in Africa." *Id*. at 237:11-240:18, 264:13-265:17. Alternatively, Dr. Goldsmith theorized that Ms. Muchira would not have communicated about her alleged depression on Facebook because this could jeopardize her employment. *Id*. at 237:11-239:1. These are precisely the type of expert theories, opinions and analysis that Rule 26(a)(2)(B) mandates Plaintiff produce in a timely fashion, not spring on Defendants in deposition for the first time.

### ii. *Rule 37(c)(1) Requires the "Automatic Sanction" of the Total Exclusion of Dr. Goldsmith's Testimony*

Plaintiff should receive the automatic sanction, pursuant to Rule 37(c)(1), of excluding Dr. Goldsmith as an expert witness due to his failure to comply with the requirements of Rule 26(a)(2)(B). The objective of the Federal Rules of Civil Procedure is to ensure that litigation proceeds in an orderly fashion and to prevent exactly the type of surprise that occurred here when Dr. Goldsmith blindsided Defendants during his deposition by offering opinions and relying on sources that were previously not disclosed in his expert report.

Rule 26 requires that an expert report contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them;" and "(ii) the facts or data considered by the witness in forming them." Fed. R. Civ P. 26(a)(2)(B). As described above, Dr. Goldsmith's expert report did not disclose the substance of his expert testimony nor the facts considered in forming his expert opinions, which he ambushed Defendants with during his deposition. This prevented Defendants from adequately rebutting his theories or preparing for deposition. *See, e.g., Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir.2006) ( "Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein,

and none shoulder the burden to independently investigate and ferret out that information as best they can at the expense of their client."). The consequences of Plaintiff's failure to disclose Dr. Goldsmith's opinion (nor supplement it at any point) are clear under Rule 37(c)(1):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed.R.Civ.P. 37(c)(1). This provision "impose[s] an "automatic sanction" of exclusion of a party's expert witness for failure to adhere to the expert witness requirements set forth in Rule 26(a)," *Campbell*, 470 Fed.Appx. at 156; *see also S. States Rack & Fixture, Inc. v. Sherwin–Williams Co.,* 318 F.3d 592, 592 n. 2 (4th Cir.2003).

Neither of the two exceptions to the sanction of automatic exclusion of the expert apply here, as Plaintiff's failure to identify the existence and basis of Dr. Goldsmith's opinions was neither 'substantially justified' nor 'harmless.' *See Wilkins,* 751 F.3d at 222. First, Plaintiff's failure to fully disclose Dr. Goldsmith's all opinions or theories he will express at trial and the facts or data considered by him in forming such opinions or theories is particularly prejudicial given that this omission was known – but never disclosed – to counsel for Defendants prior to this information being elicited during his deposition. Second, there is no justification for Plaintiff's failure to inform Defendants of this omission, leaving this "surprise" for Defendants to uncover at Dr. Goldsmith's deposition more than a month after his report was submitted and after Defendants' rebuttal report had been served.

Specifically, Dr. Goldsmith testified that Plaintiff's counsel provided him with Ms. Muchira's Facebook postings sometime between November 15, 2014 – the date he examined Ms. Muchira – and November 20, 2014 – when he completed his report, although he could not recall the exact date. Goldsmith Dep. at 123:21-124:4, 127:9-12. Dr. Goldsmith testified that he

realized on approximately December 15, 2014 that he had omitted from his report any reference to his review of and opinions regarding Ms. Muchira's Facebook account. *Id.* at 97:16-20. Finally, Dr. Goldsmith said he told counsel for Plaintiff Christina Davis on Friday, December 19, 2014 – three days before his deposition on December 22 – that, in his expert report, he neglected to list Ms. Muchira's Facebook postings among the materials he considered in forming his opinions. *Id.* at 112:9-19, 272:21-273:9.

Based on Dr. Goldsmith's testimony, Plaintiff's counsel knew that they had provided Dr. Goldsmith with Ms. Muchira's Facebook postings before he completed his expert report and they served it on November 21, 2014. Plaintiff's counsel also knew that Dr. Goldsmith's report did not make any mention of the fact that he had read those Facebook postings and that they were not included among the materials Dr. Goldsmith said he considered in forming his opinions. Yet, although Plaintiff's counsel was well aware of the significance Defendants have placed upon those postings, as reflected in questions posed by Defendants in earlier depositions and in motion papers Defendants have filed with the Court, Plaintiff did not inform Defendants at any time after November 21 of the omissions from Dr. Goldsmith's expert report.

Moreover, regardless of the reason Plaintiff did not rectify their failure to provide an accurate disclosure of Dr. Goldsmith's opinions and material reviewed immediately after November 21, they were certainly reminded of that failure on Friday, December 19, 2014, when Dr. Goldsmith told Ms. Davis [counsel for Plaintiff ] about it. Still, Plaintiff told Defendants nothing. Indeed, on Saturday, December 20, 2014, Ms. Davis sent Defendants' counsel Neil Koslowe an e-mail, ostensibly in response to one he had sent to Plaintiff's counsel Deborah Yates on December 16, 2014, saying that "Dr. Goldsmith will bring with him to his deposition any material on which he relied in forming his expert opinion that have not already been

provided and identified."  Ex. U, Email from Koslowe to Yates, Dec. 16, 2014 & Ex. V, Email from Davis to Koslowe, Dec. 20, 2014.  Ms. Davis did not say anything about Dr. Goldsmith's failure, in his report, to include Ms. Muchira's Facebook postings among the materials he considered in forming his opinions.  Defendants were puzzled by Ms. Davis' e-mail, because all material upon which Dr. Goldsmith relied in forming his expert opinion previously should have been provided and identified, and Mr. Koslowe said so in his return e-mail the next day, December 21, 2014.  Ex. W, Email from Koslowe to Davis, Dec. 21, 2014.   Plaintiff's counsel did not respond further.

As a result, Defendants have been prejudiced in at least five ways by these events.  First, Dr. Khin Khin needlessly had to devote an important part of her research and rebuttal report to addressing Dr. Goldsmith's failure to read and consider Ms. Muchira's Facebook postings, and defendants needlessly had to pay for that.  Second, Dr. Khin Khin could not devote any portion of her rebuttal report to Dr. Goldsmith's consideration of and theories about Ms. Muchira's Facebook postings because they were not in his expert report.  Third, much of counsel's preparation for the deposition of Dr. Goldsmith turned out to be a waste of time and money.  Fourth, defendants were denied the opportunity adequately to prepare for and question Dr. Goldsmith about his review and consideration of Ms. Muchira's Facebook postings, and counsel was compelled to do so on the fly.  Finally, as a result of Plaintiff's failure to initially comply with Rule 26(a)(2)(B) nor supplement Dr. Goldsmith's report[10], Defendants *still* do not have a plain recitation of Dr. Goldsmith's expert opinions as required by Rule 26(a)(2)(B).

---

[10] More than two weeks have now passed since Dr. Goldsmith's deposition, and Plaintiff has not served any supplemental or amended report from Dr. Goldsmith acknowledging or correcting these errors.

Plaintiff's failure to comply with Rule 26(a)(2)(B) is therefore neither substantially justified or harmless, and the automatic sanction of exclusion pursuant to Rule 37(c)(1) must be imposed.

## CONCLUSION

Plaintiff has been treating her obligations of discovery in this case as optional and inconvenient. Defendants have the right to discover the basis for Plaintiff's claims and contradictory evidence in her possession. Defendants have been significantly prejudiced as a result of Plaintiff's failure to comply with numerous aspects of her discovery obligations. For the foregoing reasons, the Saudi Family respectfully requests that the Court grant its Renewed Motion to Compel Discovery, further grant its Motion for Sanctions and finally grant its request to extend the discovery period and for such other relief as this Court might find appropriate.


Dated:  January 2, 2015                                    Respectfully submitted,


                                                   /s/ Jay M. McDannell
                                                  Jay M. McDannell (VA Bar No. 45630)
                                                  Luisa Caro (*admitted pro hac vice*)
                                                  Erica Mueller
                                                  Potomac Law Group, PLLC
                                                  1300 Pennsylvania Avenue, N.W.
                                                  Suite 700
                                                  Washington, DC 20004
                                                  Telephone:  703-718-0171
                                                  Email: jmcdannell@potomaclaw.com

                                                  Neil H. Koslowe (*admitted pro hac vice*)
                                                  Shearman & Sterling LLP
                                                  801 Pennsylvania Avenue, N.W.
                                                  Washington, DC 20004
                                                  Telephone:  202-508-8118
                                                  Email:  neil.koslowe@shearman.com

                                                  *Attorneys for Defendants*

## CERTIFICATE OF CONSULTATION AMONG COUNSEL

Pursuant to Local Civil Rules 7(E) and 37(E), I certify that counsel for defendants conferred with counsel for Muchira via lengthy telephone conferences on December 31, 2014 and exchanged multiple emails in a good faith effort to resolve the discovery matter at issue in this motion.

  /s/ Jay M. McDannell
Jay M. McDannell (VA Bar No. 45630)
Potomac Law Group, PLLC
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC 20004
Telephone:  703-718-0171
Email: jmcdannell@potomaclaw.com

## CERTIFICATE OF SERVICE

I certify that today, January 2, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send a notification of such filing (NEF) to the following:

Deborah Anne Yates
Wilmer Cutler Pickering Hale & Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Email:  deborah.yates@wilmerhale.com

   /s/ Jay M. McDannell
Jay M. McDannell (VA Bar No. 45630)
Potomac Law Group, PLLC
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC 20004
Telephone:  703-718-0171
Email: jmcdannell@potomaclaw.com