IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| WINFRED MUCHIRA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14-cv-770 (AJT/JFA) |
| | ) | |
| HALAH AL-RAWAF, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

On June 7, 2012, Plaintiff Winfred Muchira (Plaintiff or "Muchira"), a then 35 year old

citizen of Kenya, signed a contract in Saudi Arabia to work as a housemaid in the United States

for the Defendants Halah Al-Rawaf and her three children, Defendants Ibraheem, Fahad, and

Luluh Al-Rashoudi ("Defendants" or the "Saudi family"). On July 28, 2012, Plaintiff arrived in

the United States with the Defendants and was admitted under a tourist visa valid for a period of

six months, which was later extended to May, 2013. On March 29, 2013, while Defendants were

out of town, Plaintiff, in the presence of law enforcement, left Defendants' residence where she

was living and working and terminated further employment with the Defendants.

On June 23, 2014, Plaintiff filed this action pursuant to The Trafficking Victims

Protection Act (TVPA), 18 U.S.C. § 1595, which provides a civil remedy for violations of Title

18 of the United States Code, Chapter 77. Specifically, Plaintiff alleges the following violations

of Chapter 77: (1) involuntary servitude in violation of the Thirteenth Amendment and 18 U.S.C.

§ 1584 (First Claim for Relief); (2) trafficking with respect to peonage, slavery, involuntary

servitude or forced labor in violation of 18 U.S.C. § 1590 (Second Claim for Relief); (3) forced

labor in violation of 18 U.S.C. § 1589 (Third Claim for Relief); (4) involuntary servitude in

violation of 18 U.S.C. § 1584 (Fourth Claim for Relief); (5) unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude or forced labor, in violation of 18 U.S.C. § 1592 (Fifth Claim for relief); and (6) benefitting financially from trafficking in persons in violation of 18 U.S.C. §§ 1593A and 1595 (Sixth Claim for Relief). Plaintiff also alleges civil conspiracy (Seventh Claim for Relief); unjust enrichment (Eighth Claim for Relief); false imprisonment (Ninth Claim for Relief); intentional infliction of emotional distress (Tenth Claim for Relief); violation of the Fair Labor Standards Act, 29 U.S.C. § 216 (Eleventh Claim for Relief); and punitive damages (Twelfth Claim for Relief).

This matter is before the Court on Defendants' Motion for Partial Summary Judgment [Doc. No. 125] ("the Motion"), which seeks summary judgment on all claims except her FLSA claim against Defendant Al-Rawaf in her Eleventh Claim for Relief.[1]  For the reasons stated below, the Motion is DENIED as to Plaintiff's unjust enrichment claim (Eighth Claim for Relief), her claim that Defendants conspired to unjustly enrich themselves (Seventh Claim for Relief), and her FLSA claim (Eleventh Claim for Relief) and is otherwise GRANTED.

---

[1] On September 5, 2014, the Court denied Defendants' motion to dismiss and to quash service. On February 6, 2015, after the Department of Justice confirmed that it had closed its investigation into Defendants' actions and was not initiating a criminal prosecution against them, the Court lifted the stay it had issued on January 15, 2015, pursuant to the TVPA's mandatory stay provision, 18 U.S.C. § 1595(b).  In lifting that stay, the Court concluded that this action should not be stayed based on the possibility of Virginia state criminal proceedings. Doc. No. 119.  The defendants filed the pending motion for partial summary judgment on February 17, 2015.

# I. FACTS [2]

Plaintiff came from a poor family in Kenya, one of eight children, with an eighth grade education. She had been providing hotel cleaning services in Kenya for some time when at age 32 she learned from her sister and her pastor that there was an opportunity for her to work as a housemaid in Saudi Arabia for the Saudi family. She expressed interest and after receiving information about her from her pastor, the Saudi family made an offer to employ her as a housemaid and a cook, which she accepted while in Kenya. *See* Pl.'s Ex. 1 at ¶ 19. Plaintiff flew to Saudi Arabia on December 28, 2010 at Defendants' expense and worked for the Saudi family, primarily as a housemaid. She remained in Saudi Arabia, working in Defendants' household, until May 2012, when she returned to Kenya at Defendants' expense to visit her sick mother. Thereafter, Plaintiff spent three weeks in Kenya and then returned to Saudi Arabia in order to accompany the Saudi family to the United States. [3]

---

[2] The record contains materially conflicting statements by or attributed to Plaintiff including those in (1) Hotline memoranda concerning calls to or from Plaintiff between March 13, 2013 and March 29, 2013, submitted as Pl.'s Ex. 6 [Doc. No. 134-6]; (2) an interview memorandum by Home Security investigators of an interview of Plaintiff at the U.S. Attorney's office for the Eastern District of Virginia on April 1, 2013, three days after Plaintiff removed herself from the defendants' residence, submitted as Def. Ex. I [Doc. No. 127-9]; (3) Plaintiff's sworn declaration dated June 26, 2014 in support of her T-Visa application, submitted as Pl.'s Ex. 1 [Doc. No. 134-1] and Def. Ex. H [Doc. No. 127-8]; (4) Plaintiff's Facebook postings, *see* Def. Ex. R, U, V, W, Y, DD and HH [Doc. Nos. 127-18, 21, 22, 23, 25, 30, and 34]; and (4) Plaintiff's deposition taken on January 8, 2015 and February 12, 2015 submitted in its entirety as Def. Ex. J and K [Doc. Nos. 127-10 and 127-11]. The facts stated herein are undisputed in the record, except where otherwise indicated.

[3] As reflected in Homeland Security interview memorandum, Plaintiff told investigators on April 1, 2013, that the Saudi family contacted her while with her family in Kenya to propose that she accompany them to the United States, that while in Kenya, she had decided not to return to the Saudi family but this offer changed her mind. *See* Def. Ex. I at 000036 ("Muchira responded she went back because United States is a good place, she could make good money and the whole family would not be there so she would be there would be less work.") Plaintiff later recounted in her sworn statement in support of her T-Visa application that the Saudi family asked her to

On June 7, 2012, before leaving for the United States, Plaintiff signed a contract with Defendant Al-Rawaf to work as a housemaid in the United States.[4] Under the contract, Plaintiff was to receive $1,600 per month (less required withholdings), calculated on the basis of 40 hours per week at $10 per hour; and "[i]f the need arises for extra working hours, [Plaintiff] will be paid an hour and half $15 per hour." However, before Plaintiff left Saudi Arabia for the United States, the Saudi family told her she would only receive $400 per month and Plaintiff did not object. *See* Pl.'s Dep. Tr. at 173:9-10 (Plaintiff "agreed" to the modification "according to what they [the Saudi family] decided."). Nevertheless, in accordance with Defendants' instructions, when she was interviewed at the U.S. Embassy in Riyadh in order to obtain the required visa, Plaintiff told the embassy official that she would be paid the $1600 per month listed in her written contract. As she explained at her deposition, she followed Defendants' instructions because she wanted to accompany the Defendants to the United States. *See* Pl.'s Dep. Tr. at 171:3-6 ("if I refuse [to lie about her contract] it could not help me…They [Defendants] going to get another girl and go with her."). During that interview, she was also provided with, and kept within her possession, a telephone number in the United States for reporting any mistreatment.

---

accompany them to the United States *before* she left Saudi Arabia to visit her family in Kenya. Pl.'s Ex. 1 at ¶¶ 38-39. The Court does not consider any conflicts in Plaintiff's recollections on this point material to the Court's decision.

[4] Plaintiff was also entitled to receive without charge "accommodation and food as per the prevailing standards ofthe United States," "any medical costs related to [Plaintiff] as per the U.S. laws," and "such official holidays as determined by U.S. laws." Defendant Al-Rawaf also promised that she would "not ask [Plaintiff] to remain on the premises …after working hours without compensation," and that she would treat the Plaintiff "in a fair and humane way." Plaintiff agreed that while in the United States, she would not accept any other employment or work for a third party "with or without compensation." The term of the contract started "in the same day of arrival of the [Plaintiff] in the United States …and ends when [Defendant Al-Rawaf] leaves the United States." *See* Def. Ex. L.

4

Plaintiff has described various reasons for her decision to accompany Defendants to the United States, including that she thought "the [Saudi] family would have to treat me better in the United States" and "like a person," she would work less hours because Defendants' entire family would not be there, and she regarded the United States as a "good country and a country where everyone has rights." Overall, she thought "God had answered my prayers because finally I would be able to earn money to send to my family." Pl.'s Ex. 1 at ¶¶ 40-41; *see also* Def. Ex. I.

Plaintiff arrived in the United States with the Saudi family on July 28, 2012. Plaintiff and Defendants Al-Rawaf and Ibraheem Al-Rashoudi were admitted under six-month tourist visas; Defendants Fahad and Luluh Al-Rashoudi were admitted under student visas. Under the terms of her tourist visa, Plaintiff was not permitted to engage in any employment other than for the Saudi family.

Once in the United States, the Saudi family initially provided Plaintiff with a one-bedroom, one-bath apartment. She had possession of the key to that apartment and she lived there alone, while the Saudi family was residing in another apartment in the same building. Beginning late October 2012, the Saudi family moved with the Plaintiff into a substantial detached home in Vienna, Virginia, which the Defendants rented for $6,750 per month. At that residence, Plaintiff was provided her own bedroom on the basement level that included a bathroom and a walk-in closet, with access to a small kitchen, a media room, and a back yard. The Saudi family also provided to her with meals and her maid's uniform and paid for a cellphone, which the Plaintiff kept in her possession.[5] Plaintiff's only complaint concerning her accommodations is that the thermostat controlling the temperature in her bedroom was located

---

[5] During her employment, Plaintiff was provided with at least five different cellphones, which Defendants would replace whenever Plaintiff's cellphone broke. *See* Pl.'s Dep. Tr. at 360:12-361:21.

on the main level of the house, the temperature in the bedroom was on occasions too cold and Defendants did not provide a space heater until five months after moving into the house.

Plaintiff worked for the Saudi family in the United States for approximately eight months. Her duties included assisting Defendant Al-Rawaf prepare meals, washing the dishes, vacuuming the rooms in the home, making the beds in four bedrooms and doing the laundry and ironing. On certain days, Plaintiff would take out the trash, and on other days, she would accompany a Saudi family member to the grocery store and help bring the grocery bags into the house. She would move furniture on occasion and wash windows approximately twice a month. She would also accompany the Saudi family on various family outings, including to Kings Dominion amusement park, New York City, dinners, trips to ice skating rinks, parks and shopping malls. During at least some of these outings, she was required to provide child care and other services for the Saudi family. *See* Pl.'s Dep. Tr. at 126:1-127:22.

Plaintiff has not given a clear account of when her work day began and ended. Plaintiff testified at one point in her deposition that she worked continuously, up to 15 hours per day, or more, without rest, seven days a week. But she elsewhere testified that she had no set schedule, she would sleep until 6:30 AM to 7:30 AM, shower and dress and then begin her duties. *See* Pl.'s Dep. Tr. at 706:16-18; 707:4-5; 708:19-709:14. She also testified that she would usually be alone with Al-Rawaf during the day while the adult children attended school. Some days she would be constantly busy, while on others there would be breaks in her work, such as when she would sit with Defendant Al-Rawaf while Al-Rawaf drank her tea. She had a daily lunch break and there were also times during the days when she would not be actively working at all and would be able to rest or engage in non-work activities. *See id.* at 39:2-7; 77:20-78:1. For example, as reflected on her Facebook page, she talked on her cell phone and posted and received messages on her

Facebook page throughout the day. Overall, her testimony, construed as a whole and most favorably to Plaintiff, establishes that she worked long hours and was subject to Defendants' demands that she perform various duties throughout the day until Defendants went to sleep, usually around 11:00 PM to Midnight.

Throughout her employment in the United States, Plaintiff was in regular telephone contact with friends and family, both in the United States and Kenya, including her mother, sisters, both male and female friends, a former boyfriend, her current boyfriend, and a pastor in Boston. She also posted regularly on Facebook where she recounted her daily activities and experiences. [6] Nevertheless, Plaintiff claims, and the Court accepts as true for the purposes of the Motion, that during her employment with Defendants, Plaintiff felt isolated, dependent, and restricted. The house was protected by a security alarm, without any ability on her part to disarm it if she left the house.[7] She did not know anyone in an unfamiliar neighborhood and understood, in any event, that she was expected to comply with the "house rules" that apply to "a housemaid in Saudi Arabia." *See* Pl.'s Dep. Tr. at 70:7-12, 106:17-18; 108:14-15. Under those "house rules," she was not to go outside without Defendants' permission or without being accompanied

---

[6] Overall, the record reflects that Plaintiff posted and received approximately 15,000 Facebook messages, none of which suggest any abuse. Plaintiff acknowledges that some of these postings, such as those expressing her happiness and good fortune to be in the United States, were in fact true. *See* Pl.'s Dep. Tr. at 568:2-21. Plaintiff claims that others, however, were outright fabrications, posted for the comfort of her friends and family, including those that referred to her attending church and her efforts in March, 2013 to obtain "papers" in order to stay in the United States after the defendants left in May, 2013. *See* Pl.'s Dep. Tr.at 702-03.

[7] In her Complaint, Plaintiff alleges that she was "locked in" the house. *See* Cmpl. at ¶ 4. At her deposition, Plaintiff conceded that she did not need a key to leave the house, rather the "alarm was like their lock" and she did not ask for the code. *See* Pl.'s Dep. Tr. at 140:2-142:14.

by a member of the Saudi family or speak to anyone in the neighborhood and relinquish control of her passport to Defendants.

The record does not reflect definitively how much money Plaintiff received for her services. Plaintiff testified that she was paid $400 per month.[8] In addition to Plaintiff's meals and living accommodations, the Saudi family also covered the costs associated with Plaintiff's cellphone, their various trips and outings, and the maid's uniform she was required to wear when working. The Saudi family also gave her occasionally small amounts of money during trips and sometimes "gifts" for her "extra hours" or more difficult work because of such events as visiting relatives or guests. *See* Pl.'s Dep. Tr. at 126:17-21, 615:3-616:9; 629:15-630:15. She sent most, if not all, of her money to her family in Kenya; and for that purpose, she was periodically driven to a Western Union or Moneygram outlet by a member of the Saudi family, who assisted her to making the transmissions, paid the transaction costs and sometimes added amounts to what was being sent. For this purpose, Plaintiff was given access to her passport, which Defendants otherwise kept in their possession and control.

In December 2012, Defendant Al-Rawaf decided to extend her stay in the United States. For that purpose, she arranged to have her and Plaintiff's tourist visas extended for six months until May 2013. Although Plaintiff did not explicitly consent to extending her contract in the United States, she did not object to the extension when she learned of it no later than January,

---

[8] Plaintiff testified that she received $400 in August, September, and October 2012 and a cash advance of $1200 for November 2012, December 2012, and January 2013, totaling $2,400 for her work between August 2012 and January 2013. The record reflects that between August 2012 and March, 2013, Plaintiff wired to her family in Kenya $3,520, an amount more than what she claims she was paid during that period.

2014.[9] She nevertheless began to complain to certain friends about her work hours and low pay and her interest in finding a new job. *See* Rose Ngigi Dep. Tr. at 29:4-30:1. When she learned that the Saudi family would, in fact, be returning to Saudi Arabia in May, 2015, she told Defendant Al-Rawaf that she did not want to return with her to Saudi Arabia and Defendant Al-Rawaf purchased an airline ticket for her to return directly to Kenya, on the same day as Defendants' departure to Saudi Arabia, together with an airline ticket for Plaintiff to return to Saudi Arabia from Kenya two weeks later.[10]

On March 13, 2015, with the encouragement of her friend living in Alabama, to whom she had been complaining about her employment, Plaintiff called the Hotline for the Polaris Project, a service provider partner for the Northern Virginia Human Trafficking Task Force. In that call, and in calls on March 18, 2013 and March 20, 2013, Plaintiff, though not claiming that she had been physically abused or mistreated, complained about her working conditions and low pay and asked for assistance in obtaining a different job. She reported that she was scheduled to leave with the Defendants in May and that she did not want to leave with them.[11] On March 29,

---

[9] The record contains a contract of employment dated December 21, 2012, bearing a signature over Plaintiff's name. Pl.'s Ex. 5. At her deposition, Plaintiff testified that the signature is hers but that she has never seen that contract. *See* Pl.'s Dep. Tr. at 45:14-15; 46:1-3. The contract states, *inter alia*, that Plaintiff had been receiving $1600 per month and $40 per hour for each hour she worked over 40 hours per week; that she was required to do "all tasks necessary to accompany and support [Defendants'] family members," and that except when working she was free to leave the premises. Pl.'s Ex. 5 at ¶¶ 1, 3 and 4.

[10] Plaintiff testified at her deposition that Defendants told her that they had purchased a ticket to Kenya for her on the same day they were leaving for Saudi Arabia. *See* Pl.'s Dep. Tr. at 586:5-19, 587:9-12,16, 588:1-2.

[11] As memorialized in the Hotline memoranda, Plaintiff complained that she received only $400 instead of $1600 and that she agreed to the $400 per month only because "she was desperate to continue working for the family." She also reported that "she was required to do a lot of work and would only get Sundays days off so that she could go to church" and that "her employers do

9

2013, in coordination with the Hotline Center while the Saudi family was out of town, Plaintiff

left Defendants' house unassisted and was met by Fairfax county police officers, who had been

dispatched to Defendants' residence by the Hotline Call Center.[12] Sometime shortly thereafter,

at the suggestion of the police, Plaintiff made a police monitored phone call to a member of the

---

not prevent her from leaving but they don't really allow her the opportunity to go out." Pl.'s Ex.
6 at p. 3. As a result, "she works many more hours than she would otherwise and only leaves to
go grocery shopping with the family." *Id.* She also complained about not having control of her
documents. Overall, Plaintiff is reported as saying that she "does not wish to report her
employers as she does not feel that they are mistreating her, however the [plaintiff] would like to
get a new job." *Id.* In that regard, "her employers are intending to return to Saudi Arabia in May
2013 and she will either have to work for them or return to Kenya." *Id.* Plaintiff was advised
that the Hotline Call Center could not assist her in finding a new job but could provide her with
assistance in understanding her rights and her options. On March 18, 2013, the Hotline Call
Center called Plaintiff with contact information for an outside source of assistance. Based on the
conversation with the Plaintiff, the Hotline representative noted that "she will be forced to leave
with [the defendants] to go to Kenya on 3/22 and [she] does not want to go. [The plaintiff] wants
to escape." Pl.'s Ex. 6 at p. 7. The Hotline representative further recorded that Plaintiff "believes
that if she goes back to her country that she will be forced to work with them again….she is not
forced to stay, but she does not want to stay with them." *Id.* On March 20, 2013, the Hotline
Center again contacted Plaintiff by telephone and obtained her permission to contact an attorney
on her behalf and to provide her contact information. Plaintiff re-iterated that she was not being
mistreated, but "would like to arrange to leave when her employers are planning to leave for
vacation as she is supposed to be leaving with them and will be able to retrieve her passport at
this time." *Id.* at p. 8.

At her deposition, Plaintiff confirmed that she had made certain of the statements attributed to
her in the Hotline memoranda while she disputed, or qualified, other statements. Some
statements, she both confirmed and denied making at different points in her deposition. In
reaching its decision, the Court has not accepted as true any statements attributed to Plaintiff
whose accuracy she disputed at any point in her deposition.

[12] As reflected in the Hotline memoranda, Pl.'s Ex. 6, beginning on March 27, 2013 at 11:02 PM,
the Hotline Center, not having heard from Plaintiff further after March 20, 2013, attempted to
reach Plaintiff by phone and received a message on her cellphone that calls could not be accepted
at that time. Thereafter, the Hotline Call Center called Plaintiff four times before reaching her at
8:36 AM on March 29, 2015 and then again at 11:07 AM. During those conversations, Plaintiff
is recorded as saying that Defendants were out of town until March 30, 2013, the next day, that
she wished to leave, that she would gather her belongings, and that she wanted law enforcement
assistance to help with disabling the house alarm. The Hotline Call Center then called the Fairfax
County Police Department to assist with the "extraction."

Saudi family to request her passport. [13]  During that phone call, Defendants agreed to deliver

Plaintiff's passport to the Kenyan embassy and did so on April 9, 2013.  Since leaving the Saudi

family's employment, Plaintiff has applied for and received a T-Visa pursuant to 8 U.S.C.

§1101(a)(15)(T)(i)(I),[14] which allows her to remain in the United States while human trafficking

charges against Defendants are being investigated or prosecuted and authorizes her to engage in

other employment, which she has obtained, first as a part-time babysitter and then, beginning in

July 2013, as a housekeeper.

## II. LEGAL STANDARD

Summary judgment is appropriate only if the record shows that "there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986);

*Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996). The party seeking

summary judgment has the initial burden to show the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[13] As the Plaintiff left Defendants' house, the security alarm protecting the house sounded and the security company notified the Saudi family that the alarm had activated.  The Saudi family was not immediately notified that the plaintiff had left with a police officer and tried unsuccessfully to call the Plaintiff, who did not answer their call at the direction of the police officer. Thereafter, the Saudi family checked with local hospitals; and on April 1, 2013, the Saudi family filed a missing person report.  The following day, Defendant Luluh Al-Rashoudi sent a Facebook message to Plaintiff, without a response.  The record does not reflect any further contact between the parties other than Plaintiff's phone call to obtain her passport.

[14] In order for a T–Visa to be issued, a law enforcement officer must submit a letter to immigration authorities, declaring that the Visa applicant has been the victim of a "severe form of trafficking in persons," and an applicant must comply with any reasonable request for assistance in a law enforcement investigation or prosecution of the acts of trafficking. The Plaintiff filed such an application with a supporting Declaration on July 3, 2014 and was issued a T-Visa on a date not reflected in the record. *See* March 20, 2015 Tr. at 10:5-25.

*Anderson,* 477 U.S. at 248. Once a motion for summary judgment is properly made and

supported, the opposing party has the burden of showing that a genuine dispute exists.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). The facts shall

be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving

party. *Anderson,* 477 U.S. at 255; *see also Lettieri v. Equant Inc.,* 478 F.3d 640, 642 (4th

Cir.2007). To defeat a properly supported motion for summary judgment, the non-moving party

"must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248. Whether

a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Id.*[15]

## III. ANALYSIS

### A. Plaintiff's TVPA claims (First through Sixth Claims for Relief)

Defendants challenge the sufficiency of the evidence concerning Plaintiff's claims under

the TVPA, which fall into two categories: (1) Plaintiff's claims that she was "held to"

involuntary servitude in violation Section 1584[16] and that her services were obtained through

---

[15] Defendants argue that summary judgment should be entered in their favor because Plaintiff's testimony is inconsistent and self-contradictory in material respects and therefore inherently unreliable, citing cases where courts have entered summary judgment on that basis, including on TVPA claims. *See Jeffries v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005); *Garnica v. Edwards,* No. 13 Civ. 3943 (AKH), 2014 WL 7180395, at *1 (S.D.N.Y. Dec. 11, 2014); *Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 104 (2d. Cir. 2011); *Taylor v. Ridley,* 904 F. Supp. 2d 222, 232 (E.D.N.Y. 2012). Plaintiff's deposition testimony is, indeed, difficult at times to understand and appears to contain material inconsistencies and other statements that are incomprehensible. Nevertheless, the Court does not base its decision on the reliability of Plaintiff's testimony but rather on the undisputed aspects of her testimony.

[16] 18. U.S.C. § 1584 (a) provides:

actual or threatened force, physical restraints, or "serious harm" to herself or others, in violation

of Section 1589[17] (First, Third Claim and Fourth Claim for Relief); and (2) Plaintiff's claims

---

Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

[17] 18 U.S.C. § 1589(a)-(c) provide:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
(2) by means of serious harm or threats of serious harm to that person or another person;
(3) by means of the abuse or threatened abuse of law or legal process; or
(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
shall be punished as provided under subsection (d).

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

(c) In this section:
(1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
(2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

under 18 U.S.C. § 1590[18] (Second Claim for Relief), 18 U.S.C. § 1592[19] (Fifth Claim for Relief),

and 18 U.S.C § 1593A[20] and 1595[21] (Sixth Claim for Relief), all of which depend on

Defendants' alleged violations of Sections 1584 or 1589.

---

[18] 18. U.S.C. § 1590(a) provides:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

[19] 18 U.S.C. § 1592(a) provides:

> (a) Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person--
> > (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a);
> > (2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; or
> > (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000, shall be fined under this title or imprisoned for not more than 5 years, or both.

[20] 18 U.S.C. § 1593A provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of section 1581(a), 1592, or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation, shall be fined under this title or imprisoned in the same manner as a completed violation of such section."

[21] 18 U.S.C. § 1595(a) provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have

**(1) Plaintiff's claims that she was held to involuntary servitude and that her services were obtained through actual or threatened force, physical restraints or serious harm.**

Plaintiff's First and Fourth Claims for Relief allege a violation of 18 U.S.C. § 1584, which imposes liability on anyone who "knowingly and willfully holds to involuntary servitude ... any other person for any term, or brings within the United States any person so held." Plaintiff's Third Claim for Relief alleges a violation of 18 U.S.C. § 1589, which imposes liability on anyone who "knowingly ...obtains the labor or services of a person" by means of (1) "force, threats of force, physical restraint, or threats of physical restraint to that person or another person;" (2) "serious harm or threats of serious harm to that person or another;" (3) "the abuse or threatened abuse of law or legal process;" or (4) "any scheme, plan or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." Plaintiff proffers essentially the same evidence in support of both claims.

There is no evidence sufficient to establish that Defendants coerced, threatened or forced her to accompany them to the United States against her will, either before or after she learned of the actual payment she would receive in the United States. Pl.'s Dep. Tr. at 360:8-11(being brought by Saudi family to the United States was "not against my will."). Nevertheless, Plaintiff contends that she was forced into "involuntary service" with the Defendants because it was her only "real choice," given her lack of other employment opportunities in Saudi Arabia and Kenya, *see* Doc. No. 134 at p. 11 and 14, and the pressure she felt from her pastor in Kenya who had assisted her in obtaining employment with Defendants. But there is no evidence that Defendants

---

known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."

were responsible for Plaintiff's lack of other more attractive employment opportunities in Saudi Arabia or Kenya or her sense of obligation or coercion because of her pastor's involvement. In short, there is no evidence sufficient to establish that she had been sold into slavery or "held to" involuntary servitude in Saudi Arabia by the defendants when she was brought to the United States or that her agreement to work for Defendants in the United States as a housemaid was "involuntary" for the purposes of the TVPA.

The evidence is likewise insufficient as a matter of law to establish that once in the United States she was held to involuntary servitude through Defendants' threats of serious harm. Plaintiff concedes that she was not physically mistreated, harmed or explicitly threatened in any way, either before or after arriving in the United States. *See* Pl.'s Dep. Tr. at 139:6-21. She also does not claim that she was physically restrained or imprisoned or lacked the physical ability or means to leave Defendants' home at any time. Rather, she claims that she was held in "a *psychological* prison that Defendants created in Saudi Arabia and transported over to the United States." Doc. No. 134 at p. 2 (emphasis in original). In that regard, she claims that "she was conditioned by Defendants to follow 'the rules in the house as a housemaid' in America, just as she was required to follow them in Saudi Arabia," requiring her to "accept illegally low wages, routinely work 15-hour days, allow Defendants to take and possess her passport, and never leave the house alone." *Id.* at p. 2. These rules, according to Plaintiff and her experts, led to a sense of isolation, vulnerability and dependency that prevented her from exercising free will; and she was therefore subjected to a condition of "involuntary servitude."

As reflected in the statutory elements of Plaintiff's claims, the central issue does not concern the terms and conditions of Plaintiff's employment, as such, but rather the volitional nature of that employment. No matter how unpleasant the work, or the conditions under which

services are provided, the critical inquiry for the purposes of the TVPA is whether a person provides those services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice. *See United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981), where the Fourth Circuit, in accordance with the "generally accepted definition of 'slavery' under § 1583," defined a slave as "... a person who is wholly subject to the will of another, one who has no freedom of action and whose person and services are wholly under the control of another, and who is in a state of compulsory service to another." That is not to say that the nature of the services provided or the conditions under which they are provided are irrelevant to the inquiry whether a person provides services "voluntarily" or "involuntarily." Reasonable inferences with respect to those issues can sometimes be drawn from both the nature of the services and the conditions under which they are provided. But here, the evidence concerning the nature of her duties or the circumstances under which she was required to perform them does not allow any reasonable inference that she was held to involuntary servitude. Plaintiff does not claim any lack of physical comforts in her accommodations at Defendants' residence. The chores she was required to perform were those generally associated with those of a housemaid; and without minimizing the physical or emotional demands of her work or the long hours she was on duty, she has not described either work or work conditions reflective of "slavery" or "involuntary servitude." [22] She also has not described any term or condition of her employment, however unfair or unpleasant, that was not

---

[22] Plaintiff alleges that the physical nature of the work resulted in her "dislocat[ing] [her] back on the job" and that she "was denied medical treatment even though she was in so much pain, she thought she was going to collapse." Doc. No. 134 at p. 23. During her deposition, Plaintiff similarly testified that Defendants "could not take me to the hospital while I complain I'm sick," but could not specify any specific occasion when she asked Defendants to go to the hospital, other than that it occurred less than 5 times. Pl.'s Dep. Tr. at 92:11-93:4.

disclosed to or understood by her before agreeing to come to the United States, which she regarded as her only "reasonable choice."

In short, Plaintiff has not described with any specificity or objective evidence the "serious harm"[23] she experienced or feared that forced her against her will to remain in Defendants' home and service when she would have otherwise left. She feared that she would incur "the [Saudi] family's wrath if she left the house unaccompanied" and that "if she fled Defendants' home and was forced to return to Kenya . . . she owed her pastor money for referring her to work for Defendants and lacked the money to pay him back. She was concerned that the pastor would force her to repay him and otherwise 'punish' her for leaving Defendants." Doc. No. 134 at p.14. But there is no evidence that Plaintiff was, or thought she was, prohibited under the "house rules" from terminating her employment, that Defendants ever threatened her with any consequences if she terminated her employment or that Defendants were in any way responsible for her pastor's demands for repayment. [24]

---

[23] *See infra* at n.17.

[24] Nor is the evidence sufficient to establish that Defendants ever threatened Plaintiff with serious harm if she violated the "house rules." Plaintiff concedes that Defendants never identified the "house rules" that applied in the United States, they never enforced the "the house rules" in the United States to actually prevent her from engaging in any specific conduct she attempted, and that she never asked and was never refused permission to engage in any of the activities she thought prohibited by the "house rules." Rather, it appears from her testimony that she assumed that the protocols and cultural norms that applied in Saudi Arabia, as enforced by Defendants during her employment in Saudi Arabia, as well as in her home country of Kenya, would continue to govern her conduct in the United States. *See* Pl.'s Dep. Tr. at 60:18-61:17 ("not saying" that Defendants told her in the United States she was not allowed to go outside), 62:12-16 ["even if [defendants] don't actually [tell me] in America, when I met the family the first time [in Saudi Arabia], I found everybody it not suppose to go out, is suppose to stay with them inside, unless you are being accompanied by them."), 70:16-18 ("[e]ven in my family [in Kenya], if I want to go somewhere, I ask my dad or my mon I want to go somewhere. My mom say yes or no."). Nevertheless, the Court accepts as true, for the purpose of the Motion, that Defendants made clear that they expected compliance with the "house rules" in the United

18

There is also no evidence that before Plaintiff left on March 29, 2013, she ever requested that her employment be terminated or otherwise attempted to leave Defendants' employment. The only evidence that Plaintiff ever attempted to end the parties' employment relationship is that at some point after learning that the Saudi family would be returning to Saudi Arabia in May, 2013, and her employment in the United States would end, Plaintiff told Defendant Al-Rawaf that she did not want to return to Saudi Arabia with them and in response to that position, Defendant Al-Rawaf purchased an airplane ticket for the Plaintiff to travel directly to Kenya on the same day Defendants would leave for Saudi Arabia.

Plaintiff also claims that she suffered non-physical emotional abuse that forced her to remain in Defendants' employment when she would have otherwise left. But, there is insufficient evidence to support Plaintiff's conclusory characterizations of her treatment. The conduct she points to as the source of her emotional abuse (occasional shouts and verbal reprimands by some of the defendants and claimed refusals to take her to church or the hospital) is, by her own descriptions, insufficient as a matter of law for a jury to find that Defendants eliminated her practical ability to extricate herself from her employment relationship. *See e.g.*, Pl.'s Dep. Tr. at 94:9-95:3 (Plaintiff describes an incident when one of the defendants scolded her for talking too much on her cell phone while she was working and Plaintiff shouted back at her.); *id.* at 92:11-93:21(Plaintiff appears to testify that she was given medication rather than being taken to the hospital); *id.* at 67:4-68:9, 71:4-8 (Plaintiff testifies that Defendants never actually prohibited her from attending church, but rather found excuses not to transport her to and from church, even though one of the Defendants had assisted Plaintiff in locating churches in

States, although there is insufficient evidence to establish that Plaintiff felt unable to terminate her employment because of the house rules.

19

the neighborhood.). Rather, her testimony establishes that she thought she was free to terminate her employment relationship once her contract period ended in May, 2013, she never attempted to terminate it or was prevented from terminating it before that contract expired and, as events demonstrated, she had the practical ability to terminate that relationship even earlier, once she had made the decision to do so.

The Court accepts, as Plaintiff claims, that she feared that she would face certain consequences or hardships upon leaving Defendants' employment and home, including arrest. But Plaintiff had no legal right to work other than for the Defendants; and there is no evidence sufficient to establish that any felt sense of imprisonment was attributable to any threats of serious harm by the Defendants (including any threats of arrest), as opposed to her correctly understanding that under the terms upon which she was granted permission to live in the United States, she did not have the ability simply to leave Defendants' employment and legally work elsewhere. While the "house rules" may have made her life more onerous and less pleasant than it otherwise might have been, the evidence is insufficient to establish that those "house rules" ever prevented Plaintiff from doing what she ultimately did do –terminate her employment and not return to Kenya, then scheduled for less than a month away, almost immediately after she decided upon that course in order to pursue whatever opportunities she had in the United States. *See* Pl.'s Dep. Tr. at 483:7-485:8 ("I learn that in America there is opportunities like one . . . chance to go back to school and continue with my education, which I believe when I go to Kenya, at my age I'm not able to go to a certain level of education. . .").

Finally, Plaintiff claims that she was forced to remain in Defendants' employment through an "abuse of law or legal process" in violation of Section 1589(a)(3) when they instructed Plaintiff to lie to American embassy officials in order to obtain a visa and violated

federal labor laws. But the evidence is insufficient as a matter of law to establish any conduct

that meets the definition of "abuse or threatened abuse of law or legal process" set forth in

Section 1589(c)(1).[25] In any event, there is no evidence sufficient to establish that any of the

relied upon conduct forced Plaintiff to accompany Defendants to the United States against her

will or to remain in Defendants' service, when she would have otherwise terminated that

relationship.[26]

Based on the record, viewed most favorably to Plaintiff, the evidence is insufficient as a

matter of law for a fact finder to conclude that she remained in Defendants' employment because

of threats of serious harm that deprived her of her ability to exercise free will and terminate her

relationship with Defendants. The evidence is therefore insufficient as a matter of law to

establish that Defendants held Plaintiff in "involuntary servitude" in violation of 18 U.S.C. §

1584 (First and Fourth Claim for Relief) or that the Saudi family obtained her labor by means of

any of the conduct prohibited under 18 U.S.C. § 1589 (Third Claim for Relief).

### (2) Plaintiff's claims dependent on violations of Section 1584 and 1589.

Plaintiff claims that Defendants (1) recruited, transported and harbored her in order to

obtain her forced, coerced and involuntary labor in violation of Section 1590 (Second Claim for

---

[25] *See infra* at n. 17.

[26] For these reasons, this case is fundamentally different than the cases relied on by Plaintiff. For example, in *United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004), the defendants were convicted of "forced labor" where they "lured" Jamaican laborers to New Hampshire to work at a tree removal company with promises of high wages and then refused to pay the promised wages after the workers arrived in the United States; the workers were housed in trailers without water, electricity or heat; defendants engaged in physical assaults and threatened to "destroy" anyone who ran away; and defendants prevented or hindered victims from seeking medical treatment for injuries. *Id.* at 149. *See also United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009), where workers were "threatened them with physical force," and "threat[ened] to have immigration authorities arrest and deport the workers if they did not 'comply' with the [defendants'] directives").

Relief); (2) knowingly destroyed, concealed, removed, confiscated or possessed plaintiff's

passport and immigration documents in the course of violating Section 1589 and Section 1590

(Fifth Claim for Relief); and (3) knowingly benefitted financially from participating in a venture

that violated Sections 1581(a), 1592 or 1595(a) (Sixth Claim for Relief). Having concluded that

there is insufficient evidence in the record to support Plaintiff's claims that Defendants violated

Sections 1584 or 1589, or any other predicate offense under the TVPA, Plaintiff's remaining

claims under the TVPA must necessarily be dismissed.[27]

### B. Civil Conspiracy (Seventh Claim for Relief)

Plaintiff's Seventh Claim for Relief alleges that Defendants conspired "to accomplish

human trafficking, peonage, and unjust enrichment or to benefit financially from [Plaintiff]'s

services through these unlawful means." Having concluded that Plaintiff's TVPA claims should

be dismissed as a matter of law, Plaintiff's civil conspiracy claim predicated on the TVPA

violations is, therefore, also dismissed. However, for the reasons explained below as to the

unjust enrichment claim (Eighth Claim for Relief), the Court denies the Motion as to Plaintiff's

claim that Defendants conspired to unjust enrich themselves through Plaintiff's employment.

### C. Unjust Enrichment (Eighth Claim for Relief)

Plaintiff claims that Defendants were unjustly enriched as a result of her services.

Defendants challenge the legal sufficiency of that claim on the grounds that this equitable

remedy is not available where, as here, there is in fact an express contract in place between the

parties. *See WRH Mortgage, Inc. v. S.A.S. Associates,* 214 F.3d 528, 534 (4th Cir. 2000) (Where

---

[27] 18 U.S.C. §1592 requires a violation of §§1584, 1589 or 1590. Section 1593A requires a violation of §§ 1592 or 1595(a). Sections 1590 and § 1595(a) require the showing of other actions in "violation of this chapter."

a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie."); *Trident Products and Services, LLC, v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 781 (E.D.Va. 2012) ("Virginia law is clear that a plaintiff cannot raise an unjust enrichment claim where an express contract governs the alleged wrongdoing.). Plaintiff contends that the admitted existence of an express contract notwithstanding, the enforceability of those contracts is at issue and must be resolved in order to adjudicate her unjust enrichment claim. Given the unresolved legal and factual issues pertaining to Plaintiff's FLSA claim (Eleventh Claim for Relief), and without ruling on the merits of Plaintiff's contentions concerning the relationship between her FSLA and unjust enrichment claims, the Court denies the Motion.

### D. False Imprisonment Claim (Ninth Claim for Relief)

Relying on the same evidence proffered in support of her TVPA claims, Plaintiff claims that Defendants falsely imprisoned her. As discussed above, Plaintiff concedes that she was never physically restrained or imprisoned or threatened with physical restraint. The record also establishes that there were occasions when she was outside of the Defendants' home unaccompanied by Defendants and she in fact left Defendants' home on March 29, 2013. *See, e.g.* Pl.'s Dep. Tr. at 123:12-124:21; 127:9-128:8; *see also W.T. Grant Co. v. Owens*, 149 Va. 906, 141 S.E. 860 (Va. 1928) ("False imprisonment is defined as the direct restraint by one person of the physical liberty of another without adequate legal justification."). Plaintiff claims that the evidence is sufficient under Virginia law to establish false imprisonment because she felt threatened with restraint if she attempted to leave. *See Doe v. Siddig*, 810 F. Supp. 2d 127, 137 (D.D.C. 2011) ("Under Virginia law . . . it is sufficient that the defendant used "force, words, or acts" of which the plaintiff was "afraid to ignore or to which [she] reasonably believe[d] [she]

must submit.") (citing *Zahand v. United Airlines Inc.*, 1994 WL 1031381, at \*3

(Va.Cir.Ct.1994)). *See also* Swisher et al., *Virginia Practice* § 2:11 (under Virginia law, false

imprisonment not limited to restraint by "stone walls and iron bars"). As discussed above, there

is no evidence that Defendants ever threatened Plaintiff with "force, words, or acts" that would

cause her to reasonably believe that she would be physically restrained if she attempted to leave.

The evidence is therefore insufficient as a matter of law for a reasonable jury to find that

Defendants falsely imprisoned the Plaintiff.

### E. Intentional Infliction of Emotional Distress ("IIED") (Tenth Claim for Relief)

Defendants challenge Plaintiff's IIED claim on the grounds that the evidence is

insufficient to establish that Defendants engaged in conduct that was "outrageous and

intolerable" and that Plaintiff suffered severe emotional distress because of Defendants'

conduct.[28]

The tort of IIED is not favored in Virginia. *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va.

2007). In order to qualify as actionable conduct for the purposes of an IIED claim, the conduct

must be "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). Based on the record, as

discussed above, the evidence is insufficient to meet that very high threshold, as that threshold

has been described by the Virginia Supreme Court. Plaintiff was not physically abused or

---

[28] "Under Virginia law, to recover for intentional infliction of emotional distress, four elements must be proved: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." *Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522, 534 (E.D. Va. 2007) *aff'd sub nom. Hatfill v. The New York Times Co.*, 532 F.3d 312 (4th Cir. 2008).

restrained or threatened with physical harm or restraint, or otherwise threatened with any other serious harm, and the long hours and other conditions of employment she describes do not rise to the required level of intolerable conduct for the purposes of an IIED claim. *See Delk v. Columbia/HCA Healthcare Corp.,* 523 S.E. 2d 826 (Va. 2000) *(*evidence of "outrageous conduct" sufficient if defendant, operator of a psychiatric facility, failed to notify a patient that the person who sexually assaulted her while a patient was known to be HIV positive).

As to Plaintiff's claim that she suffered a sufficiently high level of emotional distress as a result of Defendants' conduct, "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo, supra,* 400 S.E.2d 160, 163 (Va. 1991). *See also Harris v. Kreutzer,* 271 Va. 188, 205, 624 S.E.2d 24, 34 (2006) (facts insufficient to support severity element where plaintiff's symptoms "include[d] nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling. . . mortification, humiliation, shame, disgrace, and injury to reputation."); *Cf. Almy, supra,* 639 S.E.2d at 188 (IIED claim adequate where plaintiff's alleged emotional distress "rendered her functionally incapable of carrying out any of her work or family responsibilities.").

In addition to Plaintiff's descriptions of her treatment and her mental state, as discussed above, the record contains two mental health evaluations and a stipulation concerning her lack of impairment to work after leaving Defendants' residence. Plaintiff's forensic psychiatric expert, Dr. Eric Goldsmith, diagnosed Plaintiff with a "major depressive disorder" in the "mild to moderate range," with its "symptoms resolv[ing] fairly quickly after the stressor seemed to resolve." *See* Goldsmith Dep. Tr. at 48:14-49:13, 173:17-174:12. Victoria Hougham, a Licensed Independent Clinical Social Worker, determined that Plaintiff "met the criteria for a diagnosis of

Acute Stress Disorder with Panic Attacks … that lasted the duration of her employment and up to around three months after she left Al-Rawaf's home." *see* Pl.'s Ex. 12 at ¶ 7 ("Psychological Evaluation of Winfred Muchira" dated April 23, 2014).[29] Finally, the parties have stipulated that throughout Plaintiff's post-April 1, 2013 employment, she has been able to perform all her duties "without impairment" and that her employers have not observed any conduct by her that they associate with the conditions or symptoms of Acute Stress Disorder with Panic attacks, as described in Ms. Hougham's psychological assessment of the Plaintiff. *See* Def. Ex. EE.

Based on the entire record viewed most favorably to the Plaintiff, the Court concludes that the evidence is insufficient as a matter of law for a reasonable juror to conclude that Defendants engaged in the conduct or that Plaintiff suffered the level of emotional distress necessary to state a claim for intentional infliction of emotional distress. The Court therefore grants the Motion as to the intentional infliction of emotional distress claim.

---

[29] Ms. Hougham's evaluation was based on "an initial intake" with Plaintiff in March, 2013, "frequent case management meetings" with her between April, 2013 and April, 2104, and a "series of clinical interviews" with Plaintiff between January and March 2014. During the clinical interviews, Plaintiff was "cooperative" and "did not exhibit any signs of thought process problems or other cognitive process impairments." She "showed a full range of appropriate affect but primarily presented a depressed and sad mood. " Pl.'s Ex. 12 at ¶ 6. Based on Plaintiff's descriptions and recollections, Plaintiff was assessed as having experienced during her employment with Defendants and, with some symptoms, for a time after her employment "intrusion symptoms," (dreams of abuse at the hands of the Defendants), "negative alterations in mood" (an inability to experience happiness or satisfaction, loneliness and alienation), "arousal symptoms" (an inability to sleep, with thoughts of self- blame, and fear of arrest), "avoidance symptoms" (after leaving Defendants' home, staying inside her home for fear of encountering Defendants and being arrested), "dissociative symptoms" (flashbacks to abuse experienced during employment), and panic attacks (chest pain, dizziness, shortness of breath , a sense of dying, abdominal distress and fear of being returned to Kenya where she would not have access to medical care.). *Id* at ¶¶ 9-14. As a result of the many "positive relationships" that Plaintiff developed through clinical services, she "quickly reduced many of the symptoms that occurred as a result of the traumatic work experience with Ms. Al-Rawaf."

**F. FLSA Violation (Eleventh Claim for Relief)**

Defendants Ibraheem, Fahad, and Luluh Al-Rashoudi claim that they are not "employers" under the FLSA and that claim must therefore be dismissed as to them.

"The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. [] Under this broad definition, an individual may be the employee of more than one employer at a given time. [] And under the statute, 'all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the' FLSA." *Jackson v. Mayor & City Council of Baltimore City,* No. CIV JFM 08-3103, 2009 WL 2060073, at *3 (D. Md. July 14, 2009) (internal citations omitted). "Rather than rely on any technical test, the Supreme Court has held that under the FLSA, courts should apply an "economic reality" test to determine whether an employment relationship exists. [] While no one factor or set of factors is decisive, the following four factors have been utilized by courts conducting such an analysis: (1) the authority to hire and fire employees; (2) the authority to supervise and control employee work schedules or conditions of employment; (3) the authority to determine the rate and method of payment; and (4) maintenance of employment records." *Id.* (citing *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)). [30]

Defendants argue that it is undisputed that Plaintiff was under contract with Defendant Al-Rawaf only. Pl.'s Ex. 5. Plaintiff counters that her FLSA claim is properly made against all of the defendants because the other three Defendants can also be considered her statutory

---

[30] 29 U.S.C.§ 203 (d) defines "Employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization."

employers, her testimony regarding who was her "boss" notwithstanding. *See* Pl.'s Dep. Tr. at 89:16-19, 392:20-21; 425:16-17; 505:9-10,

    (1) Authority to hire and fire

Defendants stipulated that Ibraheem Al-Rashoudi arranged to find a house maid for the family, that Plaintiff was referred and the "*family* hired [her] for this purpose." Def. Ex. F. at ¶ 11 (emphasis added).

    (2) Authority to supervise and control work schedule and working conditions

The parties' Employment Contract dated June 7, 2012 provides that Plaintiff was to serve as a housemaid to "[Defendant Al-Rawaf] and her family members who will assign [Plaintiff] duties related to the job of [housemaid]." Def. Ex. L, Article (1) Job Classification. Defendants have also stipulated that before coming to the United States, "members of the Saudi Family discussed [Plaintiff's] anticipated working conditions in the United States with [Plaintiff]" and that "[m]embers of the Saudi Family assured [Plaintiff] that she could attend church in the United States." Def. Ex. F at ¶¶15-16. Plaintiff essentially testified that each of Defendants supervised and corrected her work *See* Pl.'s Dep. Tr. at 89:9-90:10 ("every single one of the defendants shouted at [her]" when she would make a mistake).

    (3) Authority to determine rate and method of payment

Defendants stipulated that "Plaintiff received her salary in cash from Defendant Al-Rawaf, while Defendant Fahad witnessed Plaintiff sign on a signing sheet that she received that salary." Pl.'s Ex. 15 at ¶ 10. Plaintiff further testified that it was Defendant Ibraheem Al-Rashoudi who communicated to Plaintiff that her salary in the United States would be reduced from $1,600 per month to $400 per month. *See* Pl.'s Dep. Tr. at 168:17-169:10.

    (4) Maintenance of employment records

Defendants stipulated that they "did not maintain a record of hours [Plaintiff] worked." Def. Ex. F at ¶ 26. However, to the extent that there were documents relating to her employment, including her employment contract, Plaintiff testified that "the family always bring papers to me and . . . tell me to sign," Pl.'s Dep. Tr. at 48:7-9.

Based on these stipulations and testimony, the Court concludes that there are genuine issues of material fact to be resolved as to whether the Defendants, in addition to Defendant Al-Rawaf, may be deemed an "employer" under the FLSA; and the Court denies the motion on that basis. *See also Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298, 306 (4th Cir. 2006) (where facts fit into one of the examples of joint employment listed in the regulation, 29 C.F.R. § 791.2(b) [31], it is not necessary for the court to consider the factors listed in *Bonnette, supra,* 704 F.2d at 1469–70, and in *Zheng v. Liberty Apparel Co., Inc.,* 355 F.3d 61, 71–72 (2d Cir.2003)).

### G. Punitive Damages (Twelfth Claim for Relief)

Based on the Court's rulings, Plaintiff's only remaining claims are for civil conspiracy (as it relates to the unjust enrichment claim) (Seventh Claim for Relief), unjust enrichment (Eighth Claim for Relief), and a violation of the FLSA claim (Eleventh Claim for relief). Punitive damages based on a civil conspiracy appear to be recoverable under Virginia law, at

---

[31] (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
    (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
    (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
    (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.
29 C.F.R. § 791.2(b).

most, only insofar as punitive damages are recoverable for the underlying substantive offense. *See Dunlap v. Cottman Transmission Systems, LLC*, 754 S.E.2d 313, 317-318 (Va. 2014) (citing with approval cases that hold that a civil conspiracy is not actionable in itself; it is "merely a method of establishing joint liability for the underlying tort."). Assuming, without deciding, that that there is a cognizable cause of action under Virginia law for a civil conspiracy to engage in unjust enrichment, the underlying substantive offense, unjust enrichment, is a quasi-contractual equitable claim that provides only for the recovery of the value of the plaintiff's services (*quantum meruit*). *See Rinehart v. Pirkey*, 101 S.E. 353, 354 (Va. 1919) (recognizing unjust enrichment as quasi-contract claim). Punitive damages are therefore not recoverable as a matter of law as to either the civil conspiracy claim or the unjust enrichment claim. *See Shaw v. Titan Corp.*, 498 S.E.2d 696, 701 (Va. 1998) ("When a plaintiff pleads and proves an intentional tort under the common law of Virginia, the trier of fact may award punitive damages."); *see also Saleh v. Univ. of Virginia*, No. CIV.A. 3:97-CV-460 R, 1999 WL 34798179, at *6 (E.D. Va. Feb. 25, 1999) *aff'd sub nom. Saleh v. Upadhyay*, 11 F. App'x 241 (4th Cir. 2001) ("At law, there is no independent, free-standing claim for punitive damages. Rather, punitive damages are an element of damages available if certain claims are proved."). Likewise, punitive damages may not be recovered for a violation of the FLSA. *See Lanza v. Sugarland Run Homeowners Assoc. Inc.*, 97 F. Supp. 2d 737, 742 (E.D.Va. 2000) ("where, as here, the statute [§ 216(b) of the FLSA] makes no explicit mention of punitive damages and the remedial scheme makes clear that the right afforded to aggrieved employees is compensatory in nature, courts may not engraft punitive damages onto the statute."). Plaintiff's claim for punitive damages must therefore be dismissed.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that there are no genuine issues of material fact and that Defendants are entitled to partial judgment as a matter of law as to Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, Seventh (except as to conspiracy pertaining to unjust enrichment), Ninth, Tenth, and Twelfth Claims for Relief.  The Motion, however, is denied as to Plaintiff's claims for unjust enrichment (Eighth Claim for Relief), civil conspiracy to obtain unjust enrichment (Seventh Claim for Relief), and violations of the FLSA (Eleventh Claim for Relief).

An appropriate Order will issue.

_____
Anthony J. Trenga
United States District Judge

April 15, 2015
Alexandria, Virginia